LAMAR CENTRAL OUTDOOR, INC., d/b/a Lamar
Advertising of Milwaukee, Plaintiff-Appellant,

v.

BOARD OF ZONING APPEALS OF the
City of MILWAUKEE,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2001AP3105. Oral argument December 6, 2004.
—Decided July 12, 2005.*

2005 WI 117

(Also reported in 700 N.W.2d 87.)

1

For the defendant-respondent-petitioner there were briefs by *Grant F. Langley, Stuart S. Mukamal,* Milwaukee, and oral argument by *Stuart S. Mukamal.*

For the plaintiff-appellant there was a brief by *Michael A.I. Whitcomb* and *Michael A.I. Whitcomb S.C.,* Milwaukee, and oral argument by *Michael A.I. Whitcomb.*

An amicus curiae brief was filed by *Catherine A. La Fleur* and *Halling & Cayo, S.C.,* Milwaukee, on behalf of the Outdoor Advertising Association of Wisconsin.

An amicus curiae brief was filed by *Claire Silverman,* Madison, on behalf of the League of Wisconsin Municipalities.

¶ 1. DAVID T. PROSSER, J.   This is a review of an unpublished decision of the court of appeals, *Lamar Central Outdoor, Inc. v. Board of Zoning Appeals,* No. 2001AP3105, unpublished order (Wis. Ct. App. June 17, 2003). In a summary disposition, the court of appeals held that the Board of Zoning Appeals of the City of Milwaukee (the Board) failed to reasonably exercise its discretion when it denied Lamar Central Outdoor, Inc.'s (Lamar's) application for a dimensional area variance to raise the height of a billboard. The Board sought review in this court, and we now affirm because the Board did not proceed on the correct theory of law and because it failed to adequately express the reasoning on which it based its decision.

¶ 2.   The Board considered Lamar's application on March 22, 2001. Since then, this court has issued three major decisions[1] relating to the law of zoning variances. In light of the revised standards we announced in those

---

[1] *State v. Waushara County Bd. of Adjustment,* 2004 WI 56, 271 Wis. 2d 547, 679 N.W.2d 514; *State ex rel. Ziervogel v. Washington County Bd. of Adjustment,* 2004 WI 23, 269 Wis. 2d 549, 676 N.W.2d 401; *State v. Outagamie County Bd. of Adjustment,* 2001 WI 78, 244 Wis. 2d 613, 628 N.W.2d 376.

cases, and through no fault of its own, the Board did not proceed on the correct theory of law.

¶ 3. We also conclude that the record does not show that the Board reasonably exercised its discretion. We are sympathetic to the Board's concern, echoed in the amicus brief of the League of Wisconsin Municipalities, that many board members are not lawyers and cannot be expected to produce a finely tuned piece of legal reasoning in each case. Nevertheless, this Board like other boards must provide enough reasoning to allow a court to meaningfully review its decision. This reasoning need not be embodied in a written decision as long as it is reflected in a transcript of the proceedings.

¶ 4. Therefore, we remand the cause to the circuit court for entry of an order directing the Board to reconsider and, if necessary, rehear and decide this matter in conformance with the new standards governing area variances. On remand, the Board must apply the appropriate legal standards and adequately express the reasons for its decision on the record.

## I. FACTS

¶ 5. Lamar leases property adjacent to Interstate Highway 43 (I-43) in Milwaukee for the purpose of maintaining an "outdoor advertising structure."[2] The structure is currently 34 feet high and is intended to be visible to northbound and southbound traffic on I-43. At some point in the past, the Wisconsin Department of Transportation (WDOT) planted trees between the structure and I-43 to serve as a noise barrier. The trees have since grown tall enough to partially obstruct the structure as viewed from I-43.

---

[2] The property is located at 1632 North 12th Street in Milwaukee.

¶ 6. At first, Lamar attempted to resolve the problem by asking WDOT to trim the trees.[3] Unable to convince the WDOT to act, Lamar elected to try to raise the structure above the treetops. Lamar calculated that to be visible above the trees, the height of the structure had to increase 20 feet, to a total of 54 feet high. As the Milwaukee Code of Ordinances limits the maximum height of such structures to 40 feet, Lamar needed an area variance in order to lawfully increase the structure's height beyond the maximum height permitted by the zoning code. Lamar therefore requested an area variance from the Department of City Development (DCD). DCD denied that request.[4] On February 7, 2001, Lamar appealed DCD's denial by filing an application with the Board requesting a dimensional variance to increase the height of the structure to 54 feet.

¶ 7. The Board's hearing on Lamar's application took place on March 22, 2001. At the hearing, the Board gave representatives from several City of Milwaukee (City) departments the opportunity to comment on Lamar's application. The DCD had the first opportunity to comment, and its representative stated:

> [W]e do oppose the variance request to raise this above the 40 foot height limit. We do not see that spirit and intent have been made. It just adds, you know, the

[3] At the Board's hearing, Lamar asserted that the WDOT had insisted upon using its own tree-trimming schedule. Although it planned on trimming the trees eventually, it would not do so at Lamar's request.

[4] Lamar also requested a special use permit pursuant to Milwaukee Code 295–513–16 because its structure is located within 300 feet of a multi-family residential district. The DCD granted that permit, and although it was briefly discussed before the Board, it is not at issue here.

ordinance is designed to keep the signs at a—a height. We do not see any exceptional circumstances here that merit that.

¶ 8.   The Department of Neighborhood Services and Department of Public Works also had the opportunity to comment, but did not. The Secretary of the Board noted that the local alderman had no opposition to the application.[5]

¶ 9.   Lamar's representatives attempted to convince the Board to grant the variance. First, they presented the Board with several photographs of the property, showing the structure both before and after it became obscured by the trees. Next, Lamar presented the Board with several maps of the area surrounding the sign. One of the maps showed nearby locations at which the Board had approved variances for signs up to 100 feet high.

¶ 10.   After Lamar's presentation, the Board discussed the application. As the Board's discussion is critical to our holding, we reproduce substantial portions of its debate:

> BOARD MEMBER WINKLER: My comment to the board is that I think this is a perfect case that illustrates a hardship. This has been a convincing presentation to me. I think the original intent or the idea of . . . a hardship was to relieve a landowner from . . . the diminished use of the property because of the configuration of the property. Now, here we have a little variance on that. It's . . . the location of the property that's become isolated. It's not the shape of the property itself, although I think the way in which to read . . . the variance requirement . . . of a hardship as it currently

[5] Alderman Willie L. Hines wrote a letter urging the Board to approve the variance.

applies to this property. We are faced with a very strong case of a hardship. That would be my comment.

CHAIRMAN ZETLEY: Further comments, questions?

BOARD MEMBER SZYMANSKI: I guess I'm not really in agreement with you on that one, Scotty. The applicant is citing some existing signage that we should use as a precedent to allow this advertising to be increased in height[ ]. Existing signage, I would hope, would further be diminished. Again, I'm not a sign aficionado. I would agree with . . . Mr. Richardson's comments that the spirit and intent has not been . . . met. And I think the hardship also has not been met, because it is intended to wind up generating some additional revenue for this facility . . . I'm . . . not of the—on the same side of the coin as you are, Scotty.

. . . .

BOARD MEMBER WINKLER: I just think with the nature of the signs . . . . Signs always have two purposes. One to generate revenue, and one to make itself known, make itself visible. I don't know what else you can do with a sign. And so if you can't go to surrounding signs as examples and then, also, illustrate as they have historically, how the property has become isolated and tree covered through no fault of their own. It's not self-imposed. And economics are always going to be . . . an element of the presentation for a hardship in sign cases.

CHAIRMAN ZETLEY: But then, if that's the case, then it can't be met according to the standard.

BOARD MEMBER WINKLER: Well, I—

CHAIRMAN ZETLEY: You're arguing that, and that's—If they can't have revenue on the sign, that's a revenue issue. That's not—That doesn't meet the height—hardship criteria. Specifically, in the . . . criteria it says it can't be based solely on economic criteria.

8

BOARD MEMBER WINKLER: Well, then it's not. Then in . . . my opinion it is not based solely on economic criteria. It's based upon visibility criteria. And the visibility because of the isolation of the property and the way the highways have all been set up to criss-cross and—and basically hem this place in, that, together with the—the DOT construction or the planting of trees convinces me we've got a hardship.

. . . .

BOARD MEMBER WINKLER: I'm voting in favor. I'm going to make a motion having found that all the criteria have been met for a variance and special use, based upon a technical review conducted by the departments, the testimony received today by the board, this exhibit, which I think will—I would offer to be Exhibit 1, marked and received, that was given to us by the applicant, and the testimony received today by the board, I move to grant this variance to run with the land.

¶ 11. The Board then voted on the application. The controlling statute requires a supermajority vote to grant such variances,[6] so that four of the five Board members had to vote "yes" in order to grant the variance. One Board member (Szymanski) voted no; three voted yes. Chairman Zetley waited until the others had voted, then spoke:

I will vote against the variance for the increased height restriction. I believe that the criteria for hardship has not been met. I believe the exceptional circumstances

---

[6] Wisconsin Stat. § 62.23(7)(e)9. (2001–02) provides that "The concurring vote of 4 members of the board shall be necessary to reverse any order, requirement, decision or determination of any . . . administrative official." All subsequent references to the Wisconsin Statutes are to the 2001–02 edition unless otherwise noted.

9

have not been met. I believe that this is an economic issue. I agree with Henry, and I believe that the—there [are] other purposes for this land. It hasn't been shown that there isn't another purpose for this land. I also believe that there is—It hasn't been shown, preservation and property rights, and third, it's—it's back to the same argument, but it's a third objection by the Chair in that just making the signs bigger and bigger isn't something that this Chair is in favor of, but that's just my third position on it. It's based that the criteria haven't been met.

¶ 12.  Chairman Zetley's "no" vote denied Lamar the supermajority it needed, so that the Board denied Lamar's appeal for the area variance. Five days later, the Board issued its written decision, in which the Board concluded that Lamar's application was "not consistent with" the Milwaukee Code of Ordinances. The Board then recited the provisions of the ordinance. Accordingly, "[o]n the basis of the Findings, Conclusions, and the record herein," the Board denied the variance.

¶ 13.  Lamar exercised its statutory right to certiorari review in the circuit court.[7] On September 19, 2001, the court affirmed the Board's decision because "It was reasonable for the board to conclude a height variance for a billboard was an economic issue. The fact that the board might have reached a different conclusion does not make the conclusion it did reach either arbitrary or capricious."

¶ 14.  Lamar appealed, and the court of appeals summarily reversed. *Lamar*, unpublished order at 1. The court concluded that the Board's "perfunctory recitation" of the criteria in the Milwaukee Code did not constitute a reasonable exercise of discretion. *Id.* at 1–2.

---

[7] *See* Wis. Stat. § 62.23(7)(e)10.

On the contrary, the court of appeals believed the Board did not exercise its discretion at all. *Id.* at 2. The court of appeals remanded the case to the circuit court to "direct [the Board] to vacate its order, apply the criteria to the facts, and provide an explicitly reasoned decision on Lamar's application." *Id.* at 2, 4. The Board sought review in this court.

## II. GENERAL PRINCIPLES
## AND STANDARD OF REVIEW

¶ 15.   The legislature has granted the zoning power to cities[8] and other local governments, but has conditioned that power with certain safeguards. Among these safeguards for cities is a board of zoning appeals, which must be created by any city exercising the zoning power. Wis. Stat. § 62.23(7)(e)1. ("The council . . . shall by ordinance provide for the appointment of a board of appeals . . . ."). The board consists of five members appointed by the mayor. Wis. Stat. § 62.23(7)(e)2. The purpose of a board is to hear appeals from any person "aggrieved" by a zoning decision of a municipal administrative official. Wis. Stat. § 62.23(7)(e)4. In order for a board to overturn the municipal official's decision, a supermajority vote—four of the five members—is required. Wis. Stat. § 62.23(7)(e)9. "The grounds of every such determination shall be stated." *Id.*

¶ 16.   This case is before us on certiorari review, and we therefore accord a presumption of "correctness and validity" to the Board's decision. *State ex rel.*

---

[8] *See* Wis. Stat. § 62.23(7)(a) (City council may exercise the zoning power "[f]or the purpose of promoting health, safety, morals or the general welfare of the community.").

*Ziervogel v. Washington County Bd. of Adjustment,* 2004 WI 23, ¶ 13, 269 Wis. 2d 549, 676 N.W.2d 401. Our review is limited to: (1) whether the Board kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the Board might reasonably make the order or determination in question based on the evidence. *Id.,* ¶ 14. We conclude that the Board's action does not satisfy the second and third prongs of this test.

## III. CORRECT THEORY OF LAW

¶ 17.   The Board took up this matter in March 2001. At the time, the controlling law was our decision in *State v. Kenosha County Board of Adjustment,* 218 Wis. 2d 396, 577 N.W.2d 813 (1998). In *Kenosha County,* the court held that the proper standard for evaluating a request for an area variance[9] was whether the landowner would be left with "no reasonable use of the property without a variance." *Id.* at 413. In other words, if the landowner had a "feasible use" without the variance, the application should be denied. *Id.*

¶ 18.   An examination of the transcript shows that at least one of the Board members attempted to apply the *Kenosha County* "no reasonable use" test. Chairman Craig Zetley, explaining his decision to cast the vote ultimately responsible for denying Lamar's application,

---

[9] In *State v. Kenosha County Board of Adjustment,* the parties disputed whether the same test should apply to use variances and area variances, and the court ultimately did not decide "whether there is a difference between the two types of variances." 218 Wis. 2d 396, 412 n.10, 577 N.W.2d 813 (1998).

remarked that "there [are] other purposes for this land. It hasn't been shown that there isn't another purpose for this land."

¶ 19.   Lamar filed its certiorari brief with the circuit court on June 12, 2001. On June 29, 2001, this court reached a divided decision in *State v. Outagamie County Board of Adjustment*, 2001 WI 78, 244 Wis. 2d 613, 628 N.W.2d 376. In *Outagamie County*, the court split over whether the "no reasonable use" standard should be "overruled (three justices), maintained but not applied to defeat the area variance in [that] case (two justices in concurrence) or maintained and applied to defeat the variance (two justices in dissent)." *Ziervogel*, 269 Wis. 2d 549, ¶ 3 (citing *Outagamie County*, 244 Wis. 2d 613, ¶ 5). In its brief to the circuit court, filed July 12, 2001, the Board cited the newly released *Outagamie County* decision.

¶ 20.   While this case wended its way through the appellate process, this court decided two more cases directly relevant to the Board's decision. In *Ziervogel*, released March 19, 2004, a more united court determined that the "no reasonable use" test was "unworkable and unfair" when used to evaluate applications for area variances. *Ziervogel*, 269 Wis. 2d 549, ¶¶ 4–5. The court revitalized a standard first announced in *Snyder v. Waukesha County Zoning Board of Adjustment*, 74 Wis. 2d 468, 247 N.W.2d 98 (1976). Under the *Snyder* standard,

> when considering an area variance, the question of whether unnecessary hardship ... exists is best explained as whether compliance with the strict letter of the restrictions governing area, set backs, frontage, height, bulk or density would unreasonably prevent the

owner from using the property for a permitted purpose
or would render conformity with such restrictions
unnecessarily burdensome.

*Ziervogel,* 269 Wis. 2d 549, ¶ 7 (quoting *Snyder,* 74 Wis.
2d at 475) (internal citations omitted).

¶ 21.   The court added that in making its determination, a board must consider the purpose of the zoning restriction, its effect on the property, and the effect a variance would have on the neighborhood and the larger public interest. *Id.,* ¶ 7. We remanded the *Ziervogel* case because "whether [the *Snyder*] standard is met in this case will depend upon the board of adjustment's consideration of the [newly announced test]." *Id.,* ¶ 42.

¶ 22.   Two months later, we released *State v. Waushara County Board of Adjustment,* 2004 WI 56, 271 Wis. 2d 547, 679 N.W.2d 514. In *Waushara County,* we reiterated the abrogation of the "no reasonable use" test for evaluating area variances. The party seeking a variance in that case asserted that the Wisconsin law on variances was "in a state of confusion" due to the interplay among *Snyder, Kenosha County,* and *Outagamie County. Id.,* ¶¶ 16–18. The court candidly acknowledged: "It is evident that there is some confusion over how to interpret and apply our decisions in *Snyder, Kenosha County,* and *Outagamie County." Id.,* ¶ 23. We stated in *Waushara County* that our purpose was to "give boards of adjustment and Wisconsin courts sufficient guidance as to how to resolve these types of cases in the future." *Id.* The court admitted that "it appears that the no reasonable use standard has been applied, since [*Kenosha County*], in a very restrictive manner." *Id.,* ¶ 32. In light of the new standards it announced, the court remanded the case for renewed consideration of the facts. *Id.,* ¶ 35.

14

¶ 23. As did the Washington County Board of Adjustment in *Ziervogel*[10] and the Waushara County Board of Adjustment in *Waushara County*,[11] the Board in the instant case evaluated Lamar's application in 2001 under the *Kenosha County* "no reasonable use" rule. At that time, the state of the law was uncertain. The very purpose of the *Waushara County* decision was to give boards of adjustment guidance in resolving area variance applications. We see no reason why, like those other two boards, this Board should not have the opportunity to reevaluate the facts under the principles we laid out in *Ziervogel, Waushara County,* and *Outagamie County.*

¶ 24. The Board's failure to proceed on the correct theory of law independently justifies a remand. However, counsel for the Board at oral argument emphasized that such a decision would not answer the critical question before the court involving whether the Board must deliver an "explicitly reasoned written decision," nor would it provide guidance to other boards of zoning appeal around the state. We agree that clarification of the court of appeals' decision is required, and accordingly, we proceed to discuss the adequacy of the Board's reasoning.

## IV. ADEQUACY OF THE BOARD'S REASONING

¶ 25. Certainly, a court's review of a zoning board's decision is deferential; the court "must accord a presumption of correctness and validity to a board of

---

[10] The application was considered on October 22, 2001. *Ziervogel,* 269 Wis. 2d 549, ¶ 11.

[11] The application was considered "in 2001." *Waushara County,* 271 Wis. 2d 547, ¶ 6.

adjustment's decision." *Ziervogel,* 269 Wis. 2d 549, ¶ 13. The court should not disturb a board's findings if any reasonable view of the evidence supports them. *Waushara County,* 271 Wis. 2d 547, ¶ 13.

¶ 26.   For certiorari review to be meaningful, however, a board must give the reviewing court something to review. *State v. Trudeau,* 139 Wis. 2d 91, 110, 408 N.W.2d 337 (1987); *see also* 3 Yokley *Zoning Law and Practice* § 18–9 at 18–62 (MacGregor rev. 2002) (hereinafter Yokley, *Zoning Law and Practice*) ("The record made before a board of adjustment is essential to an enlightened determination of its action by a governing body or by a court on review"); 3 Rathkopf *The Law of Zoning and Planning* § 62:47 at 62–133 (4th ed. (Ziegler rev.) 1975, supp. 2004) ("[T]he most common reason for a remand is that the findings of fact upon which the determination should be based are either entirely absent or are so inadequate that the determination cannot adequately be reviewed."). "The majority view is now that boards are generally required to make findings of fact and state reasons for their decisions." Yokley, *Zoning Law and Practice* § 20–16 at 20–68. In this case, the court of appeals characterized the Board's order as exhibiting an "absence of discretion." *Lamar,* unpublished order at 2. This amounts to a violation of the third prong of certiorari review.

¶ 27.   The controlling statute is pithy, providing only that "The grounds of every such determination shall be stated." Wis. Stat. § 62.23(7)(e)9. The term "grounds" is not defined in the statute. Accordingly, we look to the common, ordinary, and accepted meaning of the word. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. A "ground" in the legal sense is defined as "The

16

reason or point that something (as a legal claim or argument) relies on for validity." *Black's Law Dictionary* 710 (7th ed. 1999). The Board stated in conclusory fashion that Lamar's application was denied because it did not meet various statutory criteria. We believe that Lamar had the right to know not only the statutory criteria under which the Board rejected its claim, but also the *reasons* ("grounds") why the Board decided that the facts did not fit the statutory criteria.

¶ 28. Such an approach is consistent with historical interpretations of Wis. Stat. § 62.23(7)(e)9. In 1960 the League of Wisconsin Municipalities published *Zoning Boards of Appeal: A Manual on Their Powers and Duties with Suggested Rules of Procedure.*[12] The League intended to provide guidance for Wisconsin's boards of zoning appeal. In discussing the required form of a board's decision, the League stated:

> The decision of the board . . . must contain . . . reasons for the action taken . . . . *It is not sufficient for the board to give its reasons in the words of the statute* such as, "The variance is granted because owing to special conditions, a literal enforcement of the provisions of the ordinance will result in practical difficulty or unnecessary hardship." The exact nature of the hardship or difficulty found by the board should be stated.

*Id.* at 10 (citing Wis. Stat. § 62.23(7)(e)9.[13] (emphasis added).

---

[12] On file at Wisconsin State Law Library, Madison, Wisconsin.

[13] In the 1959 version of the Wisconsin Statutes, which were in effect at the time the League penned these words, the phrasing of Wis. Stat. § 62.23(7)(e)9. was identical to today's version. The statute has not changed.

¶ 29.    Requiring the Board to provide reasons for its determination is also consistent with common sense and traditional notions of due process. *Accord Goldberg v. Kelly,* 397 U.S. 254, 267–68 (1970) ("[Due process] principles require that a recipient have timely and adequate notice detailing the reasons for a proposed [benefit] termination.").

¶ 30.    The Board, and the League of Wisconsin Municipalities as amicus, argue that we proceed down a slippery slope if we affirm the court of appeals' conclusion that the Board's discussion was inadequate. They argue that under the court of appeals' decision, boards of zoning appeals must produce an "explicitly reasoned written decision." They note that we here consider the decision of the Board of Zoning Appeals for the City of Milwaukee, Wisconsin's largest community. In smaller communities, they observe, the boards may have less experience with governing legal standards, may not produce written opinions at all, and frequently have members who are neither attorneys nor are counseled by attorneys and cannot be expected to produce the type of finely-tuned legal reasoning expected from a court.

██

¶ 31.    We understand and are sympathetic to the League's concerns. We realize that most board members are not attorneys and recognize that many boards in this state operate without issuing written opinions. We do not expect boards of zoning appeal to produce judicial opinions. We agree, in fact, that a written decision is not required as long as a board's reasoning is clear from the transcript of its proceedings.[14]

---

[14] The League's position regarding the necessity of a written decision has apparently changed over the years. Almost 50 years ago, the League plainly stated: "The decision of the board

¶ 32.  Nonetheless, this court cannot and should not relax its standards of reasoning to the point where the standards are nonexistent. A board may not simply grant or deny an application with conclusory statements that the application does or does not satisfy the statutory criteria. *Accord* League of Wisconsin Municipalities, *Zoning Boards of Appeal* at 10. Rather, we expect a board to express, on the record, its reasoning *why* an application does or does not meet the statutory criteria. Without such statement of reasoning, it is impossible for the circuit court to meaningfully review a board's decision, and the value of certiorari review becomes worthless. *See Trudeau,* 139 Wis. 2d at 110.

¶ 33.  Finally, we address the Board's argument that it is "particularly troublesome and impractical" for a board to issue an "explicitly reasoned decision" because under the statute, the decision may effectively be controlled by a minority of the board. We disagree. Even

---

must be reduced to writing and must contain written reasons for the action taken . . . . The final disposition of an appeal or application shall be in the form of a written resolution or order." League of Wisconsin Municipalities, *Zoning Boards of Appeal: A Manual on Their Powers and Duties with Suggested Rules of Procedure* 10, 45 (1960) (on file at Wisconsin State Law Library, Madison, Wisconsin).

At oral argument, the Board's counsel repeatedly asserted that under the court of appeals' decision, boards are required to provide an "explicitly reasoned written decision." Closer review of the court of appeals' opinion reveals that it never used the word "written." Opposing counsel also conceded that the Board's decision need not be reduced to writing. Neither does the controlling statute impose such a requirement; it provides only that "The grounds of [the Board's] determination shall be stated." Finally, we are unable to locate any Wisconsin case law requiring a written decision. As neither party asks us to impose such a requirement on the Board, we decline to do so.

when a board's decision is dictated by a minority, these controlling members of the board ought to be able to articulate why an applicant has not satisfied its burden of proof on unnecessary hardship or why the facts of record cannot be reconciled with some requirement of the ordinance or statute.

¶ 34. In its written order, the Board simply stated that Lamar's application did not meet the ordinance criteria, then recited the criteria. The court of appeals correctly perceived the problem with this approach. The Board may not rest on a declaration that an application does not meet certain ordinance criteria; the Board must explain *why* the application does not meet the criteria. In this case, the Board's written order did not do so.

¶ 35. That, however, is not the end of the inquiry because, as noted above, a written determination is not always necessary. We also review the transcript of the proceedings before the Board.[15]

■

¶ 36. Member Szymanksi disagreed with Member Winkler's assessment that "We are faced with a very strong case of hardship." He also disagreed that non-conforming existing signage could be cited as precedent. He said he "hoped" existing signage "would be further diminished" because "I'm not a sign aficionado." He added that "the spirit and intent [of the ordinance] has not been met . . . [and] the hardship also has not been met, because it is intended to wind up generating some additional revenue for this facility . . . ."

---

[15] As we have noted, *see supra* n.14, we do not believe that the Board must provide a written decision. Accordingly, we proceed to consider the transcript of the proceedings before the Board.

¶ 37.   Member Szymanski's remarks that he hoped existing signage would be diminished and that he is not a "sign aficionado," however heartfelt, are not relevant to a board's determination on a request for a variance. They might be characterized as expressions of his will and not his judgment. His other remarks were conclusory statements that the application did not meet the ordinance criteria. Member Szymanski did not explain *why* the application and supporting facts did not meet the criteria. His objection to the sign's revenue generation was not only a restatement of criteria in the Milwaukee ordinances (*see* Milwaukee Code § 295–95–2-b-3–5 (alleged hardship cannot be based solely on economic grounds)), but also a near per se rejection of any variance for a commercial sign.

¶ 38.   Chairman Zetley's comments were also insufficient to justify a finding that the Board reasonably exercised its discretion. Chairman Zetley stated that he had three reasons for voting to deny the application. First, he believed "the exceptional circumstances have not been met. I believe that this is an economic issue." As we have noted, that reasoning is insufficient because it is circular. It merely restated the grounds laid out in the ordinance. Second, Zetley stated "there [are] other purposes for this land. It hasn't been shown that there isn't another purpose for this land." As we have described, this is a restatement of the now-abrogated "no reasonable use" test. Chairman Zetley's second reason is invalid. Third, Zetley stated, "making the signs bigger and bigger isn't something that this Chair is in favor of." Again, a member's personal feelings about signs are irrelevant to the Board's determination of whether the statutory criteria have been met.

¶ 39.   We conclude that the Board did not satisfactorily express its reasons for denying Lamar's applica-

tion. Our remand will allow the Board to reconsider the facts in the wake of *Ziervogel* and *Waushara County*. We caution that we believe the Board—with or without attorneys—can do a far better job of expressing its reasoning on the record. The Board must allow for meaningful certiorari review by stating the "grounds" for its decision—the reasons that Lamar's application does or does not fit the statutory criteria.

## V. CONCLUSION

¶ 40. We remand this cause to the circuit court with instructions to remand it to the Board. On remand, the Board should reconsider and, if necessary, rehear and decide this matter in conformance with the new legal standards governing area variances. The Board must also adequately express its reasons for approving or denying Lamar's application under the appropriate legal standards. This reasoning need not be embodied in a written decision as long as it is reflected in a transcript of the proceedings. We express no opinion on whether Lamar's application should be granted under *Ziervogel* and *Waushara County*. The Board is the body best suited to make such factual determinations, and we remand this cause to allow it to do so.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 41. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). The majority opinion is careful to explain that "[a] board may not simply grant or deny an application with conclusory statements that the application does or does not satisfy the statutory criteria." Majority op., ¶ 32. I agree with the rule advanced by the majority opinion.

¶ 42. The majority opinion analyzes each of the dissenters' rationales and leaves an important question unanswered: When there is no adequate written opinion, does one board member's explanation of his or her reasoning for granting or denying an application speak for a member who is silent, offering no reasoning, offers conflicting reasoning, or offers invalid or unclear reasoning?

¶ 43. A written opinion that adequately expresses reasoning in which the requisite number of board members joins is, without question, the reasoning of the Board. When there is no adequate written opinion and the court looks at the transcript of the proceedings, majority op., ¶ 3, the court no longer looks at the rationale of the board as an entity but rather looks at the rationales of individuals who comprise the board.

¶ 44. The majority opinion has left uncertain whether each member's reasoning must be analyzed when there is no written opinion of the board.

¶ 45. Here, only one of the three proponents of the variance, Board Member Winkler, expressed *any* reasoning prior to casting his vote. A second proponent, Board Member Cameron, asked, "What was the alderman's [position] on this?" Board Member Jackson seconded Board Member Winkler's motion to grant the variance, without more.

¶ 46. The majority opinion has left uncertain the procedure each member of a board must follow to ensure that the Board as a whole has provided adequate reasoning for granting or denying an application when the Board does not offer a written opinion.

¶ 47. For the foregoing reasons, I write separately.