FITZPATRICK, J.
*150 ¶1 Many employees of Milwaukee County have the right to pension benefits through the Employees' Retirement System of the County of Milwaukee (ERS), which is overseen by a Pension Board.[1] Susan Baldwin was an employee of Milwaukee County.[2] At the time of Baldwin's retirement in 2003, the Pension Board approved her monthly pension payment, and Baldwin started receiving that approved monthly payment in 2003. In 2014, *151 the ERS informed Baldwin of the following: a mistake had been made by the ERS in 2000 in determining her eligibility to receive certain service credits[3] and that error affected the Pension Board's 2003 determination of her monthly pension payment; as a result, the pension payments Baldwin received were incorrect; and she had received overpayments totaling approximately $223,000. In 2015, the ERS informed Baldwin that her monthly pension payment would be reduced significantly to adjust for the service credit error and to recoup the overpayments. In 2015, Baldwin appealed to the Pension Board the ERS's determinations that she was ineligible to receive the service credits and that her monthly pension payments would be reduced to account for the service credit mistake and to recoup the *198 overpayments. Baldwin's appeal was denied by the Pension Board. Baldwin sought certiorari review of the Pension Board's decisions in the Milwaukee County Circuit Court, and the circuit court affirmed the Pension Board's decisions. Baldwin appeals.
¶2 On appeal, Baldwin, for the first time, concedes that the Pension Board was correct when it decided that Baldwin was not eligible to receive the service credits. We accept that concession and, on that basis, affirm the circuit court in this respect. However, we agree with Baldwin that, pursuant to a time limitation contained in Pension Board Rule 1001, the Pension Board no longer had the authority in 2015 to reduce Baldwin's monthly pension payments. Accordingly, we affirm in part, and reverse in part, the order *152 of the circuit court, and remand this matter to the circuit court with directions that it remand to the Pension Board for proceedings consistent with this opinion.[4]
BACKGROUND
¶3 There is no dispute as to the following facts. Baldwin was employed by Milwaukee County from April 1984 to September 2003. Of importance to this dispute is that Baldwin was also employed by Milwaukee County for about seven weeks in 1969.
¶4 Milwaukee County administered a "Reinstatement Program" which gave County employees an opportunity to purchase, for the purpose of pension calculations, service credits for prior, non-continuous years of service. Milwaukee County and the ERS notified County employees, including Baldwin, of the program. In 1999, Baldwin made a request to purchase additional service credits based on her 1969 short-term employment with Milwaukee County.
¶5 In 2000, Robert Ott, then Corporation Counsel for Milwaukee County, circulated a memorandum which approved Baldwin's request and concluded that: Baldwin was employed by Milwaukee County in 1969; and Baldwin "should be allowed to buy back"
*153 service credits "as provided for in the Pension Board rules." A short time later, the ERS sent Baldwin a letter offering her service credit for her 1969 period of employment in exchange for a payment from Baldwin. Baldwin accepted the offer and paid the amount the ERS requested. The ERS accepted Baldwin's check and made the corresponding time of service credit adjustment. The time of service credit adjustment had the effect of changing Baldwin's employment start date from 1984 to 1969. As a result, different rules, advantageous to Baldwin, applied to the calculation of her pension benefits.
¶6 As Baldwin neared retirement, she received written confirmation from the ERS that her ERS enrollment date had been adjusted from 1984 to 1969. In 2003, Baldwin retired from her county position and, at its October 2003 meeting, the Pension Board determined that Baldwin's monthly pension payment would be $4,198.
¶7 In 2007, the ERS and Milwaukee County filed a Voluntary Correction Program application with the Internal Revenue Service and therein self-reported operational errors regarding, among other *199 things, overpayments to retirees. Also in 2007, Baldwin and other pensioners received letters from the ERS stating that, as a result of those errors reported to the IRS, their pension benefits may need to be reevaluated. At that time, the ERS took no action to modify Baldwin's benefits and did not inform Baldwin how, or even if, the ERS might take action to change her benefits.
¶8 In 2014, the ERS sent Baldwin a letter advising her that her purchase of the service credits in 2000 was invalid and her monthly pension benefit would be recalculated. But, that letter did not state how much Baldwin's payment would be reduced.
*154 ¶9 In February 2015, the ERS informed Baldwin that her monthly pension payment determined by the Pension Board in 2003 would be reduced from her then-monthly pension benefit of $5,121 to $3,705.[5] Additionally, the ERS took the position that Baldwin had been overpaid monthly pension benefits since October 2003 and informed Baldwin that she must repay $223,209 to the ERS.[6] The ERS also advised Baldwin that the amended $3,705 monthly pension payments would be further reduced by fifty percent to $1,852 until the overpayment amount was recovered in full by the ERS.
¶10 Baldwin appealed to the Pension Board the rescission of the service credits, the ERS demand for her to remit the overpayment, and the proposed reduction of her pension payments. Among other arguments, Baldwin contended that, under Pension Board Rule 1001, the Pension Board had only one year from the date on which the Pension Board determined her benefits in 2003 to address any errors related to her pension payment and, accordingly, the Pension Board no longer had the authority to reduce her pension payments.
¶11 On March 31, 2015, the Pension Board issued a written decision denying Baldwin's appeal.
*155 The Pension Board decided that Baldwin was not employed in 1969 in a position that gave her an option to enroll in the ERS at that time and, consequently, she was ineligible to purchase the service credits. The Pension Board also rejected Baldwin's interpretation of Rule 1001. As a result, the Pension Board directed that: Baldwin's purchase of the service credits was rescinded; her monthly pension payment was reduced to $1,852 per month to reflect her reduced pension and to provide repayment of the overpayments; and, after the overpayments were fully repaid, Baldwin's monthly benefit will be $3,705.
¶12 Baldwin filed a petition against the ERS and Milwaukee County in the Milwaukee County Circuit Court seeking certiorari review of the Pension Board's decisions. The circuit court affirmed the Pension Board's decisions. Baldwin now appeals.
¶13 Other material facts will be mentioned in particular parts of the discussion which follows.
*200 DISCUSSION
¶14 Baldwin argues in her brief-in-chief that we should reverse the Pension Board's decisions that Baldwin was not eligible to purchase the service credits, and the Pension Board's related decision to reduce Baldwin's monthly pension payments to correct for the service credits mistake and to recoup the overpayments. First, based on a concession in Baldwin's reply brief, we affirm the circuit court's decision concluding that the Pension Board was correct in deciding that Baldwin was not eligible to purchase the service credits. Second, we conclude that the plain language of Pension Board Rule 1001 establishes that the Pension Board no longer had the authority in 2015 to reduce *156 Baldwin's pension benefits to correct for the service credits mistake. Therefore, the Pension Board erred by reducing Baldwin's pension payments and determining that Baldwin must reimburse the ERS for the overpayments.
I. Standard of Review and Interpretation of Ordinances and Rules.
¶15 This dispute comes before us through common law certiorari review, a procedure in which a court tests the validity of a decision rendered by, as an example, a municipal board such as the Pension Board. See Ottman v. Town of Primrose , 2011 WI 18, ¶34, 332 Wis.2d 3, 796 N.W.2d 411. In certiorari review, we review the decision of the Pension Board and not that of the circuit court. State ex. rel. Harris v. Annuity & Pension Bd., 87 Wis.2d 646, 651, 275 N.W.2d 668 (1979). Our review is limited to: (1) whether the Pension Board kept within its jurisdiction; (2) whether the Pension Board proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that the Pension Board might reasonably make the order or determination in question. See Ottman , 332 Wis.2d 3, ¶35, 796 N.W.2d 411 ; see also Lamar Cent. Outdoor, Inc. v. Board of Zoning Appeals of City of Milwaukee , 2005 WI 117, ¶¶15-16, 284 Wis.2d 1, 700 N.W.2d 87 (certiorari review of the decision of a board created by the City of Milwaukee).
¶16 In certiorari review, there is a presumption of correctness and validity to a decision of a board created by a municipality.
*157 Lamar Cent. Outdoor, Inc. , 284 Wis.2d 1, ¶16, 700 N.W.2d 87. However, affording that presumption of correctness does not "eviscerate[ ] meaningful review." Ottman , 332 Wis.2d 3, ¶51, 796 N.W.2d 411.
¶17 Generally, the interpretation and application of an ordinance to an undisputed set of facts is a question of law.[7] Id. , ¶55 ; Marquardt v. Milwaukee Cty. , 2000 WI App 77, ¶10, 234 Wis.2d 294, 610 N.W.2d 496. However, "[a]n interesting question arises when a court is asked on certiorari to review a municipality's interpretation and application of its own ordinance." Ottman , 332 Wis.2d 3, ¶55, 796 N.W.2d 411. When, as here, "the municipality's ordinance appears to be unique and does not parrot a state statute but rather the language was drafted by the municipality in an effort to address a local concern ... we will defer to the municipality's interpretation if it is reasonable." See id="p201" href="#p201" data-label="201" data-citation-index="1" class="page-label">*201id. , ¶60.[8] This *158 does not mean that the Pension Board's interpretation here is reviewed "without a critical eye." See id. , ¶61 (quoting Racine Harley-Davidson, Inc. v. State Division of Hearings & Appeals , 2006 WI 86, ¶15, 292 Wis.2d 549, 717 N.W.2d 184 ). A municipality's interpretation of its own rules and applicable ordinances is unreasonable if it is, as examples: (a) contrary to law; (b) clearly contrary to the intent, history or purpose of the ordinance; (c) without a rational basis; or (d) the interpretation "directly contravenes the words of the ordinance" or rule. See Id. , ¶62.
¶18 "The rules for the construction of statutes and municipal ordinances are the same." Bruno v. Milwaukee Cty. , 2003 WI 28, ¶6, 260 Wis.2d 633, 660 N.W.2d 656 (quoting County of Columbia v. Bylewski , 94 Wis.2d 153, 169 n.7, 288 N.W.2d 129 (1980) ).[9] We start with the language of the applicable ordinances or rules. Id. , ¶7. If the meaning of the ordinance or rule is clear, then a court need not look to rules of statutory construction or other intrinsic aids. Id. Rather, "a court should simply apply the clear meaning of the [ordinance or rule] to the facts before it." Id. (quoting UFE, Inc. v. LIRC , 201 Wis.2d 274, 281-82, 548 N.W.2d 57 (1996) ). Words in an ordinance or rule must be given their common meaning. Id. , ¶8. Technical words or phrases with a peculiar meaning in the law must be construed according to such meaning. Id. , ¶20.
*159 ¶19 We now turn to the question of whether Baldwin was eligible to purchase the service credits.
II. Baldwin's Purchase of Service Credits.
¶20 In her brief-in-chief, Baldwin asserts that the Pension Board erred when it decided that she was not eligible to purchase the service credits based on her 1969 short-term employment. The Pension Board takes the position that Baldwin has not presented a developed argument supporting the view that this determination of the Pension Board was incorrect.[10] We agree that Baldwin has presented no developed argument on this point. Moreover, in her reply brief, Baldwin concedes that there is substantial evidence in the record to support the Pension Board's decision that she was ineligible to purchase the service credits.
¶21 Therefore, we do not address the merits of this issue. Rather, we deem Baldwin to have conceded this issue and, *202 on that basis, affirm the circuit court's decision affirming the Pension Board's 2015 decision that Baldwin was not eligible under Milwaukee County General Ordinances and Pension Board rules to purchase the service credits. In addition, regardless of whether Baldwin was eligible to purchase the service credits, we conclude, pursuant to a time limitation contained in Pension Board Rule 1001, that the Pension Board no longer had the authority in 2015 to reduce Baldwin's monthly pension payments. *160 III. Rule 1001.
¶22 Pension Board Rule 1001 reads as follows:
1001. Action of board final after one year.
All actions of the board affecting the status of rights of any individual employe or his beneficiaries shall be considered to be final after expiration of one (1) year from the date such action was taken.
Baldwin argues that, based on this language, the Pension Board's 2003 decision which set her monthly pension payments was a Board "action" that became "final" in 2004, and, accordingly, the Pension Board had no authority in 2015 to reduce her payments to correct for an error or to recoup overpayments. In response, the Pension Board contends that: (1) the 2003 Pension Board decision was a "routine ratification" rather than an "action"; (2) Rule 1001 is not applicable unless the Pension Board takes "action," and the Board never took any "action" on Baldwin's purchase of the service credits; (3) even if the Board's decision was an "action," Rule 1001 cannot be read as Baldwin argues because the Pension Board must be able to correct mistakes found more than one year after an action is taken by the Board; and (4) there will be adverse federal tax consequences to the Milwaukee County retirement system if Rule 1001 is interpreted to bar the ERS from collecting overpayments from Baldwin.
¶23 We conclude that, pursuant to the plain language of Pension Board Rule 1001, the Pension Board did not have the authority in 2015 to reduce Baldwin's pension payments to correct for the service credits error and to recover related overpayments because the Pension Board's 2003 decision setting the *161 amount of Baldwin's monthly pension payment was an "action" that became "final" in 2004. We reject the Pension Board's various interpretations of Rule 1001 because those interpretations are not reasonable, and we reject the Pension Board's assertion regarding the alleged adverse federal tax ramifications.
A. The Pension Board Took "Action" in 2003 and That Action Became "Final" in 2004.
¶24 Baldwin argues that, under Rule 1001, the Pension Board did not have the authority in 2015 to reduce her monthly pension amount. We agree and now discuss why we conclude that the powers and duties of the Pension Board, the events of the October 2003 Pension Board meeting, and the elements of Rule 1001 demonstrate that the decision at the October 2003 meeting regarding Baldwin's pension payment was an "action" of the Pension Board, and that action became "final" in October 2004.
1. Powers and Duties of the Pension Board.
¶25 The applicable Milwaukee County General Ordinances and Pension Board rules set forth the powers and duties of the Pension Board.[11] Milwaukee County *203 General Ordinance (M.C.G.O.) § 201.24 is lengthy, detailed, and governs the ERS. Section VIII of M.C.G.O. § 201.24 concerns administration of the ERS, and portions of Section VIII are pertinent to our analysis. M.C.G.O. § 201.24(8.1) states:
The general administration and responsibility for the proper operation of the retirement system and for *162 making effective the provisions of this ordinance are hereby vested in a [Pension Board] ....
(Emphasis added.) M.C.G.O. § 201.24(8.6) is entitled "Rules and regulations" and reads:
Subject to the limitations of this ordinance, the [Pension Board] shall , from time to time, establish rules and regulations for the administration of the funds created by this ordinance and for the transaction of its business .
(Emphasis added.) M.C.G.O. § 201.24(8.17) states:
(a) The board shall have the power to construe and interpret the system, decide all questions of eligibility and determine the amount, manner and time of payment of any benefits and reasonable administrative expenses hereunder.
(Emphasis added.)
¶26 Pension Board Rule 1019 is entitled "Determination of earnable compensation and service." It reads in relevant part:
For purposes of determining a member's eligibility for a pension and calculating the amount of a member's pension benefit, the board will rely on the compensation and service information provided by the county, and shall not independently verify a member's earnable compensation or service for any periods of county employment.
¶27 As pertinent here, these ordinances and Rule 1019 establish the following:
• The Pension Board is responsible for the "proper operation" of the retirement system and may adopt rules for the transaction of its business;
*163 • The Pension Board has the responsibility to "determine the amount ... of payment of any benefits"; and
• When determining eligibility and the amount of a pension, the Pension Board will rely on, and "shall not independently verify," certain information provided by the County, including "service for any periods of county employment."
2. October 2003 Pension Board Meeting.
¶28 There is no dispute about the relevant events at the October 8, 2003 meeting of the Pension Board. The minutes of the meeting show that the Board unanimously approved a motion to ratify the pension payment amounts for twenty-two persons, including Baldwin. Information given to the Board by the County regarding Baldwin included that she had 19.6 years of "service credit" (including the service credits for the 1969 service that she purchased in 2000) and that Baldwin should receive a "monthly amount" of $4,198. At that meeting, the Board acted as it was empowered, and required, to do under the applicable Milwaukee County General Ordinances and its own rules; that is, it voted to grant a monthly pension payment for Baldwin based on information provided by the County.
3. Rule 1001 Elements.
¶29 Returning now to Pension Board Rule 1001, we summarize its elements:
• When there is an action of the Pension Board; and *204 • That action affects the status of rights of any individual employee; and *164 • More than one year passes since that action; then
• The action is considered to be final.
In most respects, the application of Rule 1001 to the facts of this case is not disputed. There is no dispute that Baldwin was an "employee" of Milwaukee County who has the right to receive a "pension" pursuant to the Milwaukee County General Ordinances. See M.C.G.O §§ 201.24(2.4), (2.6); see also Bruno , 260 Wis.2d 633, ¶9, 660 N.W.2d 656 (defining "pension" in the context of the ERS and the Milwaukee County General Ordinances).
¶30 The parties do not dispute that, without the decision at its October 2003 meeting in which the Pension Board voted to award to Baldwin a specific monthly pension payment, Baldwin would not have received her monthly pension payment. So, that decision of the Pension Board necessarily "affect[ed]" the status of Baldwin's pension rights.
¶31 That leaves only whether, under Rule 1001, the 2003 determination by the Pension Board of the amount of Baldwin's monthly pension payment was an "action" of the Pension Board and, if so, whether the fact that, by operation of the ordinance, that "action" became "final" in 2004 means that the Board lacked the authority to revisit and reduce the pension after 2004.
4. "Action" of the Pension Board.
¶32 The meaning of the term "action" in Rule 1001 is central to our analysis, but "action" is not defined in the applicable Milwaukee County General Ordinances or the Pension Board rules. We determine *165 that the use of a dictionary is of assistance in interpreting the meaning of the word "action" in this context.[12]
¶33 Black's Law Dictionary defines "action" as: "1. The process of doing something; conduct or behavior. 2. A thing done." Black's Law Dictionary 28 (7th Ed. 1999). In light of those definitions, the word "action" in Rule 1001 encompasses a broad array of activities. By any reasonable definition of the word, the Pension Board's 2003 determination of pension payments for Baldwin was "conduct," "behavior," "a thing done," and, therefore, an "action." Accordingly, we conclude that the Pension Board's October 2003 determination of a monthly pension payment for Baldwin was an "action" of the Pension Board pursuant to Rule 1001.
5. The "Action" of the Pension Board Was "Final."
¶34 By operation of Rule 1001, once there has been an "action" of the Pension Board, that action "shall be considered final" one year later. Although the Pension Board does not directly address the topic, the question arises: "final" for what purposes? The Pension Board's arguments seemingly suggest that a Board "action" may be final for some purposes, but that it is not "final" in the sense that matters here, because, according to the Pension Board, it always has the authority to revisit a pension "action" for purposes of correcting an error. If this is what the Pension Board means to argue, we are not persuaded.
*166 ¶35 Our task here is to construe the term "final" in Rule 1001. The term is not defined in the Pension Board rules but, again, a dictionary definition is helpful in this context. Webster's II New College Dictionary defines "final" as: "1. Forming *205 or occurring at the end: LAST. 2. Of, relating to, or constituting the last element in a series, process, or procedure. 3. Ultimate and definitive: UNALTERABLE." Webster's II New College Dictionary 419 (1995).
¶36 Those definitions support the view that one year after the Pension Board took the "action" of setting Baldwin's pension amount-October 8, 2004-the Pension Board's process of setting the amount of Baldwin's pension payments was at the end of a process ultimate, definitive, and "final" pursuant to Rule 1001. Because the rule directs that finality occurs one year after the "action," the Board's pension decision regarding Baldwin was "final" in October 2004.
¶37 We do not need to address all the consequences that might flow from the action being "final." We need only address whether the finality that attaches to the Board's decision means that the Board itself loses the authority to revisit the "action." And, on that topic, we discern no reasonable interpretation of the term "final" that does not at least cover the authority of the Board. As detailed earlier, Milwaukee County vested in the Pension Board the authority and responsibility to: administer the Milwaukee County retirement system; promulgate rules for the transaction of the Pension Board's business; and determine the amount of benefits to be paid to retirees. M.C.G.O. §§ 201.24(8.1), (8.6), (8.17(a)). Here, for the purpose of conducting its business, the Board, through Rule 1001, set a time limit on the Pension Board's authority to amend or re-visit its actions; that is, one year after the *167 Board took the action. Because "finality" in the context of Rule 1001 means last, ultimate, definitive, and unalterable, we conclude that the Pension Board did not have the authority in 2015 to reduce Baldwin's pension payments.[13]
¶38 For those reasons, we conclude that the Pension Board proceeded on an incorrect theory of law when it reduced Baldwin's monthly pension benefit payment in 2015 because, beginning in October 2004, the Pension Board no longer had the authority to reduce those payments.
B. Pension Board's Interpretation of Rule 1001.
¶39 The Pension Board contends that we should defer to its interpretations of Rule 1001 and determine that the Board had the authority to reduce Baldwin's pension payments in 2015. However, we now explain why we reject each of the Pension Board's interpretations of Rule 1001 because those interpretations are not reasonable. See Ottman , 332 Wis.2d 3, ¶¶60-62, 796 N.W.2d 411.
1. "Routine Ratification."
¶40 The Pension Board asserts that the October 2003 vote of the Pension Board, in which it decided the amount of Baldwin's monthly pension, was only a *168 "routine ratification" and, therefore, not an "action" of the Board under Rule 1001. We reject this argument.
¶41 The question of whether the Pension Board took "action" on Baldwin's monthly pension payment at its October 2003 meeting is not controlled by the "routine ratification" label the Pension Board attempts to now put on that decision. Instead, the analysis is governed by the plain language *206 of Rule 1001 and the events of the October 2003 meeting.
¶42 Here, the decision of the Pension Board in October 2003 is still an "action" under Rule 1001 even if it involved a routine decision that the Pension Board was authorized to make under M.C.G.O. § 201.24(8.17(a)) and Rule 1019. Also, the Pension Board's interpretation ignores the clear language of Rule 1001. The rule does not contain an exception to the term "action" if such action was "routine ratification," and we may not amend Rule 1001 for the Pension Board's perceived benefit. See Bruno , 260 Wis.2d 633, ¶7, 660 N.W.2d 656.
¶43 In sum, we reject this interpretation of Rule 1001 advanced by the Pension Board because it directly contravenes the express terms of Rule 1001. See Ottman , 332 Wis.2d 3, ¶61, 796 N.W.2d 411.
2. The Pension Board Did Not Address the Purchase of the Service Credits.
¶44 Next, the Pension Board attempts to deflect attention away from its October 2003 action and contends that, although the ERS and corporation counsel approved the purchase of the service credits by Baldwin, the Board never specifically addressed and approved that transaction. So, according to the Pension *169 Board, it never took "action" to approve Baldwin's purchase of service credits and the October 2003 approval of Baldwin's pension payment by the Pension Board was never "final" under Rule 1001. We reject the Pension Board's interpretation of Rule 1001 because it directly contravenes the plain language of Rules 1001 and 1019. See Ottman , 332 Wis.2d 3, ¶¶60-62, 796 N.W.2d 411.
¶45 Rule 1001 cannot be reasonably interpreted to mean that, for a decision to be an "action" of the Board, the Pension Board must expressly consider and approve all determinations of service credits that underlie its decisions to award retirees certain pension payments. First, Rule 1001 contains no such requirement. Second, as was already discussed, Pension Board Rule 1019 clearly states that the Pension Board, in the course of its regular duties of setting pension amounts for retirees, "will rely on the ... service information provided by the county, and shall not independently verify a member's ... service for any periods of county employment" in determining benefits.
¶46 Moreover, the Pension Board's attempts to sever the purchase of the service credits by Baldwin from its October 2003 decision does not change the facts. As was shown, the 2003 decision of the Pension Board setting a pension amount for Baldwin constituted an "action" of the Pension Board under any reasonable view of the term "action." Whether the Pension Board approved the purchase of the service credits is beside the point and does not change the nature of the Board's October 2003 "action."[14]
¶47 Therefore, we also reject this interpretation of Rule 1001 proposed by the Pension Board.
*170 3. Correction of Mistakes.
¶48 Next, the Pension Board relies on an interpretation of Rule 1001 expressed in its 2015 decision: "Rule 1001 does not require the Pension Board to allow members to continue to receive erroneous benefits when the errors were *207 not discovered until after the one-year period expired." From that premise, the Pension Board argues that the provisions of Pension Board Rules 1001 and 1050 (concerning the correction of mistakes and collection of overpayments) should be interpreted to allow the Board to correct any mistake discovered more than one year after the Pension Board sets a retiree's monthly pension benefits and to recoup overpayments based on that mistake at any time.
¶49 We reject the Board's interpretation because it is not reasonable. Rules 1001 and 1050, read together, account for correction of errors and collection of overpayments. However, those actions are limited by the terms of Rule 1001 and cannot be taken more than one year after the Pension Board takes "action." Moreover, the Pension Board does not develop any argument which explains why some "actions" of the Board are "final" pursuant to Rule 1001 but others are not final.
¶50 The Pension Board relies on Rule 1050 as a basis for its 2015 decision to amend Baldwin's benefits and to recoup overpayments.[15] Subpart (2) of the rule is relevant and reads:
*171 (2) Offset . If a member and/or beneficiary receives benefits exceeding those to which the individual(s) is or are entitled under the Ordinances and Rules, future benefit payments to a member and/or beneficiary from ERS may be reduced until the amount of the overpayment, plus interest from the date paid, has been recovered by ERS. This right of offset shall not limit the rights of ERS to recover such overpayments in any other manner.
The Pension Board asserts that, when read together, the language in Rules 1001 and 1050 is ambiguous and we should defer to its interpretation. Specifically, the Board asserts that it is allowed, pursuant to Rule 1050, to recover overpayments made to Baldwin, and correct mistakes which lead to the overpayment, regardless of the terms of Rule 1001. We disagree.
¶51 The terms of Rule 1001 and Rule 1050 are not, as the Board argues, ambiguous. Instead, those rules can be reconciled so as to give effect to each. We are not at liberty to disregard plain, clear words of an ordinance in order to find ambiguity. Bruno , 260 Wis.2d 633, ¶19, 660 N.W.2d 656. When confronted with a possible conflict between ordinances, "we construe sections on the same subject matter to harmonize the provisions and to give each full force and effect," while seeking to avoid "unreasonable results." State v. Fischer , 2010 WI 6, ¶24, 322 Wis.2d 265, 778 N.W.2d 629.
¶52 Pursuant to the plain language of Rule 1001, the Pension Board has the ability to correct mistakes and recoup overpayments through Rule 1050, but the Pension Board has imposed a limit on its *172 own authority to correct mistakes. Specifically, under Rule 1001, any correction must be done within one year of the Pension Board's "action," and Rules 1001 and 1050 make no exception for errors found after that time. Therefore, we conclude that the Pension Board's interpretation of Rules 1001 and 1050 is not reasonable.[16] *208 ¶53 In a similar vein, the Pension Board argues that Rule 1001 cannot reasonably be interpreted as we do because Milwaukee County taxpayers will pay the higher pension payment to Baldwin and that will "breach its fiduciary obligations" to the retirement system. Restated, the Pension Board contends that it is unreasonable to interpret the ordinances and rules in a manner that makes Milwaukee County taxpayers financially liable for: (a) the mistake of the ERS and the Milwaukee County Corporation Counsel (the Pension Board's own "legal adviser") in 2000 when they mistakenly allowed Baldwin to purchase the service credits; and (b) the mistake of the Pension Board when it approved the amount of Baldwin's pension payments in 2003. In addition, the Board wants to be relieved of the effect of its own Rule 1001. However, those mistakes, and the effect of Rule 1001, do not allow this court to ignore the plain language of Rule 1001. See Bruno , 260 Wis.2d 633, ¶¶6-8, 660 N.W.2d 656. It is axiomatic that the mistakes of public officials often result in liabilities that are ultimately covered by tax dollars. The Board does not explain why this situation is unique. *173 ¶54 For that matter, so far as we can tell, the Pension Board could have drafted rules that allow it to correct mistakes after more than a year. At the same time, we observe that there is a valid reason for the time limit aspect of Rule 1001. A pension beneficiary, like Baldwin, should be able to budget and make plans as to how much money he or she will have each month from his or her pension.[17] It is entirely reasonable that a retiree be able to rely on decisions of a municipal board that is given the authority to determine the amount of pension benefits, and to know that at some defined point in time his or her payments will not be reduced to correct errors made years earlier that were no fault of the pensioner.[18]
IV. Tax Status of the ERS.
¶55 The Pension Board argues that it and the ERS are required by the Internal Revenue Service to recoup the overpayments to Baldwin, and an interpretation *174 of Rule 1001 that does not allow the recoupment of the overpayments and a reduction of Baldwin's pension benefits will adversely affect the tax status of the ERS pension plan with the IRS. We reject each of the varying positions that the ERS, Milwaukee County, and the Pension Board have taken on this issue.
¶56 First, in its 2015 decision, as an IRS-related basis to recoup the overpayments made to Baldwin, the Pension Board relied only on a Voluntary Correction Plan (VCP) that the ERS entered into with the IRS.[19] However, the Pension Board's decision did not contend that the *209 VCP required it to recoup the overpayments to Baldwin in order to avoid adverse federal tax consequences for the retirement system. Instead, the Pension Board asserted only that the VCP required the ERS to be "made whole" because of overpayments. The Board does not demonstrate that recoupment from the pension beneficiary is the sole avenue to make the retirement system whole. Moreover, at argument, counsel for the ERS conceded that the terms of the VCP have no bearing on the underlying issue of whether the Pension Board's 2015 decision was "rational or reasonable," and the County has not taken a contrary position. With that concession, there is nothing in the Pension Board's 2015 decision which leads to the conclusion that an interpretation of Rule 1001 that bars collection of overpayments from Baldwin causes adverse federal tax effects for the ERS.
¶57 Second, the Pension Board argues that the IRS requires the ERS to be administered in accord with "the plan documents," and Pension Board Rule 1050 requires the Board to recoup overpayments. It *175 then follows, according to the Pension Board, that if Rule 1001 is interpreted as a limitation on Rule 1050, the Pension Board will not be acting in accord with the terms of "the plan documents" and that jeopardizes the ERS tax status with the IRS. To support this contention, the Pension Board relies on Treasury Regulations §§ 1.401-1(a)(2) and (3). Only two portions of those Treasury Regulations contain relevant language. The first states: "A qualified pension ... is a definite written program ." 26 C.F.R. § 1.401-1(a)(2) (emphasis added). The second states that the plan "must be formed ... for the purpose of distributing to the employees or their beneficiaries the corpus and income of the fund accumulated by the trust in accordance with the plan ." 26 C.F.R. § 1.401-1(3)(iii) (emphasis added).
¶58 We conclude that Treasury Regulations §§ 1.401-1(a)(2) and (3) do not support the Pension Board's position. As an initial matter, we note that the regulations do not bar a provision such as Rule 1001 which imposes a time limitation on attempts to collect overpayments. In addition, the Pension Board ignores the fact that the time limit in Rule 1001 is as much a part of the "definite written program" as other parts of "the plan," such as Rule 1050. For that reason, if the time limit in Rule 1001 is ignored, it follows, according to the Pension Board's own logic, that the failure to abide by the time limit in Rule 1001 would also cause the ERS not to be in accord with the plan documents.
¶59 Moreover, at argument, the ERS conceded that this court's interpretation of the Pension Board rules will bind the Pension Board, meaning that our interpretation will be part of "the plan," and there will be no adverse federal tax consequences to the ERS if it complies with our interpretation.
*176 ¶60 For those reasons, we conclude that Treasury Regulations §§ 1.401-1(a)(2) and (3) do not require the Pension Board to collect the overpayments from Baldwin to avoid adverse federal tax consequences for the ERS.
¶61 Third, the County at argument contended that there are IRS authorities (not mentioned in the County's briefing at that point in time) supporting the view that, regardless of the provisions of Rule 1001, the Pension Board is required to collect the overpayments from Baldwin.[20] We invited the parties, post-argument, to supply specifics in this regard.
*210 ¶62 In the post-argument briefing, the parties referred us to IRS Revenue Procedure 2015-27 as relevant authority. Of importance is that the directives in IRS Revenue Procedure 2015-27 could have been used by the Pension Board in making its March 31, 2015 decision which denied Baldwin's appeal. That Revenue Procedure states that entities such as the Pension Board and the ERS were permitted "at their option, to apply the provisions of this revenue procedure" starting March 27, 2015.
¶63 Portions of IRS Revenue Procedure 2015-27 reflect clarifications to previous IRS Revenue Procedures.[21]
*177 We glean from that language from the IRS that, by the time of the Pension Board's March 31, 2015 decision, the Internal Revenue Service had clarified that the Pension Board was not required to recoup the overpayments from Baldwin in order to avoid adverse federal tax consequences to the ERS. Indeed, IRS Rev. Proc. 2015-17 made clear that the County itself can contribute the money to resolve the overpayment without adverse federal tax consequences for the ERS.[22]
*178 ¶64 For those reasons, we conclude that the ERS will not suffer adverse federal tax consequences if the overpayments are not collected from Baldwin because of the operation of Rule 1001.
V. Remand.
¶65 For the reasons discussed, we conclude that the Pension Board did not have the authority to reduce Baldwin's monthly pension benefit. We remand so Baldwin's pension benefit is reinstated to the amount she received at the time of the Pension Board's March 31, 2015 decision with all annual adjustments that she would have *211 otherwise received until the time of reinstatement.
¶66 Further, Pension Board Rule 1050(2)(d)(ii) concerns the Pension Board's process to recoup overpayments and states in relevant part: "If the offset is determined to be improper, the individual will be repayed the amount previously withheld." We conclude that the offset made by the Pension Board against Baldwin's benefits to collect the overpayment was "improper" pursuant to that rule. We remand so Baldwin "will be repaid the amount previously withheld."
CONCLUSION
¶67 Therefore, we affirm the portion of the circuit court order that affirmed the Pension Board's decision that Baldwin was not eligible to purchase the service credits in 2000. We reverse that portion of the circuit court order that affirmed the Pension Board's *179 decision that it had the authority in 2015 to reduce Baldwin's monthly pension payments. We remand this matter to the circuit court with directions to remand to the Pension Board for further proceedings consistent with this opinion.
By the Court. -Order affirmed in part, reversed in part and cause remanded with directions.

We follow the lead of a previous opinion and refer to this municipal body as the "Pension Board." See Marquardt v. Milwaukee Cty. , 2000 WI App 77, ¶6, 234 Wis.2d 294, 610 N.W.2d 496.

Susan Baldwin is married to Leverett Baldwin, who is also an appellant. The parties do not dispute that Leverett Baldwin has an interest in this matter as the spouse of Susan, and also that the interests of Susan and Leverett are completely aligned. For ease of reading, we refer only to Susan Baldwin.

For convenience, we will refer to these particular credits as "the service credits."

Although the Pension Board is not a party to this appeal, we note that, in at least one other appeal in which we reviewed a decision of the Pension Board, that board was a named party along with the ERS. See Marquardt v. Milwaukee Cty. , 2000 WI App 77, ¶6, 234 Wis.2d 294, 610 N.W.2d 496. At oral argument before this court, Baldwin's counsel took the position that it is sufficient that the ERS is a party, and the Pension Board is not a necessary party. Neither the ERS nor the County has argued in the circuit court or on appeal that the Pension Board is a necessary party.

Baldwin's monthly pension benefit of $5,121 was comprised of an initial monthly benefit of $4,198 plus annual adjustments of $83. Baldwin's amended monthly pension payment of $3,705 was determined by the ERS to be an initial monthly payment and annual adjustments less than those granted to Baldwin from 2003 to 2015. The parties do not assert that the increase of Baldwin's pension payments through the annual adjustments makes a difference to our analysis of disputed issues.

The $223,209 amount included the principal overpayment amount plus five percent interest.

The parties do not contend that the methodology used to interpret the applicable Milwaukee County General Ordinances is different than the methodology used to interpret the Pension Board rules. Similarly, the parties do not contend that the methodology is affected by the fact that the Pension Board is a county agency, rather than the county's general governing body. We also see no difference and, in interpreting the Pension Board rules, we apply case law concerning the interpretation of municipal ordinances.

This analysis has been distinguished from the "great weight deference, due weight deference, and no deference" granted at times to interpretations of statutes and administrative code provisions by state administrative agencies. Ottman v. Town of Primrose , 2011 WI 18, ¶63, 332 Wis.2d 3, 796 N.W.2d 411. Our supreme court has declined to "graft that framework wholesale" onto the framework for reviewing municipal decisions because it would be "unnecessarily complex and cumbersome," and the concerns of authority between judicial and executive branches of state government and the interpretation of state law do "not fit comfortably with the division of authority between the state judiciary and local government in interpreting local law." Id. , ¶¶64-65.

In Bruno v. Milwaukee Cty. , 2003 WI 28, 260 Wis.2d 633, 660 N.W.2d 656, the ERS and the Pension Board were parties to an appeal in which our supreme court interpreted Milwaukee County General Ordinances concerning pension credits for Milwaukee County retirees.

For convenience, and because the ERS and Milwaukee County generally adopt the other's arguments, we will sometimes refer to arguments as advanced by the "Pension Board" when the ERS and Milwaukee County advance the same position. We will note when there is a divergence in the positions of the ERS and Milwaukee County that could matter to our discussion.

Unless otherwise noted, the rules and ordinances mentioned in our discussion were in effect in October 2003.

We may use dictionaries in our discretion to assist us in determining the meaning of a statute or ordinance. See City of Oshkosh v. Kubiak , 2017 WI App 20, ¶12, 374 Wis.2d 337, 893 N.W.2d 271.

We have previously recognized that, in the pension context, a time limit to correct errors can be set and enforced: "The legislature could, however, establish a period of limitation after which a plan participant could not maintain an action against the Department and Board to correct an error in calculating and paying retirement benefits." Benson v. Gates , 188 Wis.2d 389, 405, 525 N.W.2d 278 (Ct. App. 1994).

We note an anomaly in the Pension Board's 2015 decision. In that decision, the Board stated that the corporation counsel made the decision "alone" in 2000 to approve the purchase of the service credits by Baldwin. This was a curious statement for the Pension Board to make because, in 2000 (and now), the Milwaukee County Corporation Counsel acted as the "legal advisor of the Board" pursuant to M.C.G.O. § 201.24(8.11).

Rule 1050 was enacted in 2012, nine years after the Pension Board approved the amount of Baldwin's pension. In light of our resolution of this issue, we need not reach Baldwin's argument that Rule 1050 cannot be applied to her retroactively.

We do not reach the issue of whether, under Rule 1001, the Board's recoupment of overpayments may continue more than one year after the Pension Board's "action" when the Board begins the recoupment of the overpayment within one year of the Board's "action." The parties have not briefed the issue and it is not relevant given the way we resolve this appeal.

That statement is especially true here. At argument, the ERS conceded that there is no allegation of fraud or wrongdoing by Baldwin in obtaining the service credits or regarding the amount of benefits awarded to her by the Pension Board in 2003.

The Pension Board argues that any interpretation of Rule 1001 which does not allow for the correction of mistakes more than one year after the Board takes action may harm beneficiaries who have been underpaid because of those mistakes. We conclude that the issue is not squarely before us and is best left for another day. While the parties briefed the issue post-argument, we do not consider the briefing sufficient to resolve the question of the effect of Rule 1001 on underpayment mistakes. It appears that this question is best addressed in the context of a specific factual scenario, with the benefit of arguments addressing that scenario.

At argument, counsel informed us that the VCP is not in the record.

Counsel for ERS, at argument, took the opposite position and stated that there are no IRS regulations which require "clawback" of overpayments made to Baldwin.

Those portions read as follows:
.02 Clarification to the correction rules on Overpayment failures. (1) Reasonable and appropriate correction.... Under these correction rules, the employer is to take reasonable steps to have the Overpayment returned to the plan. The Service has been informed that some plans have demanded recoupment of large amounts from plan participants and beneficiaries on account of plan administration errors made over lengthy periods of time, and that plan participants and beneficiaries, particularly those who are older individuals, may have financial difficulty meeting some corrective actions that have been sought by plan administrators, including the return of Overpayments with substantial accumulated interest.
(2) Flexibility in correction of Overpayment failures. Some plans may be interpreting the correction rules in Rev. Proc. 2013-12 as requiring a demand for recoupment from plan participants and beneficiaries in all cases. However, depending on the facts and circumstances, correcting an Overpayment under EPCRS may not need to include requesting that an Overpayment be returned to the plan by plan participants and beneficiaries.
(3) Description of modifications to clarify that there is flexibility in correcting Overpayment failures. Sections 6.06(3) and 6.06(4) of Rev. Proc. 2013-12 are modified to clarify that that [sic] there is flexibility in correcting an Overpayment under EPCRS. For example, depending on the nature of the Overpayment failure (such as an Overpayment failure resulting from a benefit calculation error), an appropriate correction method may include using rules similar to the correction methods of sections 6.06(3) and 6.06(4) in Rev. Proc. 2013-12 but having the employer or another person contribute the amount of the Overpayment (with appropriate interest) to the plan in lieu of seeking recoupment from plan participants and beneficiaries.
Rev. Procs. 2015-27, § 3.02 (emphasis added).

Also in post-argument briefing, the Pension Board cited provisions of Title 26 of the United States Code. However, the Pension Board never explained why those particular provisions of the United States Code apply to this factual scenario. Also, the Pension Board never explained where in the lengthy, cited sections of the United States Code there was language applicable to this case.