COURT OF APPEALS
DECISION
DATED AND FILED

May 15, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1725**

Cir. Ct. No. **2023CV2924**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

MICHAEL DWYER,

    PLAINTIFF-APPELLANT,

V.

CITY OF MONONA, CITY OF MONONA BUILDING INSPECTION DEPARTMENT, ZONING BOARD OF APPEALS OF THE CITY OF MONONA, AND DOUGLAS PLOWMAN,

    DEFENDANTS-RESPONDENTS.

---

APPEAL from an order of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed*.

Before Kloppenburg, P.J., Blanchard, and Taylor, JJ.

¶1 BLANCHARD, J. This case arises out of the decision of the City of Monona building inspector to partially rescind a building permit issued to Michael Dwyer to allow construction of a boathouse on Lake Monona. Under the initial

permit, Dwyer could run plumbing into the boathouse. The inspector partially rescinded the permit to the extent that it violated the City's zoning ordinances prohibiting boathouse "facilities" used "for the purpose of habitation." The inspector's action amounted to a rescission of the part of the permit that authorizes plumbing for the boathouse.

¶2 Explaining that he wanted the plumbing for a boathouse bathroom, Dwyer sought review of the partial rescission before the Zoning Board of Appeals of the City of Monona (the Zoning Board, or the Board). The Board upheld the inspector's decision. Dwyer sought certiorari review of the Board's decision in the circuit court. The court affirmed the Zoning Board.

¶3 In this appeal, Dwyer argues that the Zoning Board proceeded under an incorrect theory of law because it applied an unreasonable interpretation of a City zoning ordinance that prohibits "the use of a boathouse for human habitation." We conclude that Dwyer fails to show that the Board proceeded on an incorrect theory of law, given our interpretation of the ordinance and the record evidence. The Board's decision was sound under one reasonable application of the pertinent ordinance.

¶4 In a related argument, Dwyer contends that there was not substantial record support for the Zoning Board's decision that the boathouse, as designed, would be suitable for "human habitation" if it includes plumbing. We conclude that the Board's decision was supported by substantial evidence in the record. This includes evidence that the boathouse is designed and permitted to include features in addition to plumbing, such as electricity and heating, ventilation, and air conditioning (HVAC).

¶5      In the alternative, Dwyer argues that the Zoning Board's decision was arbitrary and capricious.  We conclude that this argument is unsupported.

¶6      Accordingly, we affirm.

## BACKGROUND

¶7      Dwyer owns residential property with lake frontage on Lake Monona in the City of Monona.  Dwyer applied to the City for a permit to build a boathouse on this property.  The boathouse would be detached from the residence and located on the lakeshore.  Dwyer averred that the boathouse would be used primarily for the storage of boats and equipment related to water recreation.  A permit was issued to Dwyer in November 2020.

¶8      The face of the permit contained boxes, each checked, on topics that included "Constr[uction]," "Electric[al]," "Erosion Control," "HVAC," and "Plumbing."  There is no dispute that the checked box for "Plumbing" reflected that the initial permit allowed Dwyer to pursue construction of the boathouse with plumbing of some kind, although the permit did not give plumbing specifications or state how the plumbing could be used.  There is also no dispute that, as reflected in designs contained in the record and Dwyer's consistent representations, Dwyer seeks to install the plumbing for a bathroom, specifically a toilet and sink.

¶9      After Dwyer made some construction progress on the boathouse, the City building inspector sent Dwyer a letter in July 2021 notifying him of the following.  On behalf of the City, the inspector was "rescind[ing]" any "right" that Dwyer had under the permit to include in the boathouse "facilities for the purpose of habitation."  The letter stated that this was because the City's ordinances

"expressly prohibit[]" "[t]he use of boathouses for human habitation," and that therefore Dwyer's boathouse could not include "facilities for the purpose of habitation." *See* CITY OF MONONA, WIS., ORD. § 466-28.B. (Sept. 2014) ("The use of a boathouse for human habitation … [is] prohibited.").[1] We will sometimes refer to § 466-28.B. as "the no-habitation ordinance." The letter requested that Dwyer "share revised interior plans for review by the City prior to any interior buildout taking place."

¶10 The permit was set to expire in November 2022, and Dwyer sought to extend the permit. Dwyer was issued a new building permit in December 2022, with terms that matched those in the original permit. But this time the "Plumbing" box was not checked.

¶11 Dwyer appealed to the Zoning Board to overrule the inspector's partial recission decision.[2] At a public hearing of the Board in September 2023, Dwyer submitted materials in support of his position, and members of the public submitted letters in opposition. The Board also heard comments from legal counsel for Dwyer, from community members, and from the City's attorney and

---

[1] The City of Monona's ordinances are not part of the certiorari record. We take judicial notice of the accuracy and applicability of the version of ordinances provided in the City's appendix. *See* WIS. STAT. § 902.03(1)(a) (2023-2024) (the court of appeals "shall take judicial notice of[]" "municipal ordinances in those counties in which the … court has jurisdiction"). For the remainder of this opinion, these ordinances are referenced as "MONONA ORD.," or simply "ORD." All references to MONONA ORD. ch. 466 are to the version last amended in September 2014. All references to MONONA ORD. ch. 175 are as adopted in 1994.

All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

[2] In the alternative, Dwyer sought a variance to the pertinent zoning ordinance that would allow him to build the boathouse with a bathroom. After separately considering Dwyer's request to review the building inspector's decision, the Zoning Board rejected Dwyer's request for a variance. Dwyer does not appeal the rejection of his variance request.

its zoning administrator. There is a transcript of the hearing in the certiorari record. The Board voted unanimously to uphold the inspector's decision, which it later memorialized in a written decision.

¶12 Dwyer sought certiorari review of the Zoning Board's decision in the circuit court. The court affirmed the Board's decision. Dwyer appeals. The respondents have filed a joint brief on appeal. We refer to both the respondents collectively, and to the municipality, as "the City."

## DISCUSSION

¶13 "On appeal of a circuit court certiorari decision, we review the decision of the local governmental body, not the decision of the circuit court." *Miller v. Zoning Bd. of Appeals of Vill. of Lyndon Station*, 2022 WI App 51, ¶18, 404 Wis. 2d 539, 980 N.W.2d 295. The circuit court here did not take additional evidence, and therefore the record under review is limited to the record before the Zoning Board. *See id.*; *Ottman v. Town of Primrose*, 2011 WI 18, ¶41, 332 Wis. 2d 3, 796 N.W.2d 411; WIS. STAT. § 62.23(7)(e)10.a.

¶14 Certiorari review of a municipal decision is limited to: "'(1) whether the municipality kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question.'" *Oneida Seven Generations Corp. v. City of Green Bay*, 2015 WI 50, ¶41, 362 Wis. 2d 290, 865 N.W.2d 162 (quoted source omitted); *see also Ottman*, 332 Wis. 2d 3, ¶¶37, 43 (scope of certiorari review provided by statute is identical to common law certiorari except as altered by statute); WIS. STAT. § 62.23(7)(e)10.a. (any person aggrieved by a decision of a city zoning board of appeals may commence an

action in circuit court "seeking the remedy available by certiorari"). Dwyer challenges the Zoning Board's decision to uphold the building inspector's partial rescission of the initial building permit based on the second, third, and fourth grounds. We presume that the Zoning Board's decision is correct, and Dwyer bears the burden to overcome this presumption. *See **Ottman***, 332 Wis. 2d 3, ¶¶50-51.

## I. Correct Theory of Law

¶15 Dwyer argues that the Zoning Board did not proceed on a correct theory of law because, to the extent that it relied on any interpretation at all, it unreasonably interpreted ORD. § 466-28.B., the no-habitation ordinance, to uphold the building inspector's partial permit rescission. To repeat, this ordinance prohibits "the use of a boathouse for human habitation." More generally, Dwyer argues that the Board failed to express any clear understanding of the no-habitation ordinance and failed to meaningfully apply it to the relevant facts.

¶16 We first address our standard of review in interpreting the no-habitation ordinance. More specifically, we explain why we conclude that we owe no deference to any interpretation or understanding expressed by members of the Zoning Board, because the ordinance essentially mirrors a statewide standard in the form of a legislatively authorized agency regulation. Then we interpret the ordinance and explain why we reject the interpretation advanced by Dwyer. Further below, we explain why we conclude that Dwyer does not carry his burden to show that the Board acted in a manner inconsistent with our interpretation of the no-habitation ordinance.

6

*Lack of Judicial Deference to the Zoning Board's Interpretation of a Statewide Standard*

¶17     Regarding our standard of review, courts do not "defer to a municipality's interpretation of a statewide standard." *See **Ottman***, 332 Wis. 2d 3, ¶59.  In contrast, courts do defer to a municipality's reasonable interpretation of language that the municipality drafted "to address a local concern" when the ordinance is "unique and does not parrot a state statute." *See **id.***, ¶60.  Dwyer contends that we should not defer to the Board's interpretation of the no-habitation ordinance because it essentially mirrors a "statewide standard," namely, a provision in zoning standards promulgated by the Wisconsin Department of Natural Resources.  *See* WIS. ADMIN. CODE § NR 115.05(1)(b)3. (Nov. 2024).[3]

¶18     The City does not dispute that the text of the no-habitation ordinance and WIS. ADMIN. CODE § NR 115.05(1)(b)3. are sufficiently similar to satisfy the rule in ***Ottman*** against judicial deference—so long as § NR 115.05(1)(b)3. is the type of statewide standard that the court contemplated in ***Ottman***.  But the City argues that § NR 115.05(1)(b)3. is not that type of standard.  The City observes that § NR 115.05(1)(b)3. is one of many zoning standards that counties, and

---

[3] There is no meaningful difference between the two provisions for purposes of this appeal.  MONONA ORD. § 466-28.B. states, "The use of a boathouse for human habitation and the construction or placement of a boathouse or fixed houseboat below the ordinary high-water mark of any navigable waters are prohibited."  WISCONSIN ADMIN. CODE § NR 115.05(1)(b)3. states, "The use of boathouses for human habitation and the construction or placing of boathouses beyond the ordinary high-water mark of any navigable waters shall be prohibited."

All references to the Wisconsin Administrative Code are current through the November 2024 register.

counties alone, are required to adopt.[4]  In contrast, while cities are required to adopt the separate standards for "shoreland-*wetland*" zoning established by the department of natural resources, these standards do not contain a provision prohibiting, or even addressing, the habitation of boathouses.  *See* WIS. ADMIN. CODE § NR 117.05; WIS. STAT. § 62.231(3), (6).  Based on these regulations, the City argues that ch. NR 115 "is not a statewide standard because it does not dictate or govern the requirements of municipal zoning."

¶19  The City construes *Ottman* too narrowly.  The opinion does not suggest that the only legal standards that are "statewide" for purposes of interpreting ordinances are standards that apply everywhere in the state.  Rather, the rationale expressed by the court supports a broader interpretation.  The court in *Ottman* noted as an example of a statewide standard an ordinance using language that is "'substantially similar to a state statute and to ordinances across the state.'"  *See Ottman*, 332 Wis. 2d 3, ¶57 (quoting *Marris v. City of Cedarburg*, 176 Wis. 2d 14, 33, 498 N.W.2d 842 (1993)); *see also id.*, ¶¶57-58 (City of Cedarburg ordinance at issue in *Marris* "essentially parroted" language in then WIS. STAT. § 62.23(7)(h)).  The court considered this to be sufficient to raise the concern that deference by courts to one municipality's interpretation of that language would give that municipality "disproportionate authority to influence state standards established by the legislature."  *See id.*, ¶¶58-59.  The *Ottman* court contrasted this

---

[4] *See* WIS. ADMIN. CODE §§ NR 115.01 ("The purpose of [WIS. ADMIN. CODE ch. NR 115] is to establish minimum shoreland zoning standards for ordinances enacted under" county zoning statute, WIS. STAT. § 59.692); NR 115.05(1) (shoreland zoning ordinance "adopted by each county" shall "[a]t a minimum … include" provisions including § NR 115.05(1)(b)3.); § 59.692(1c) (in part "to promote the public health, safety and general welfare, each county shall zone by ordinance all shorelands in its unincorporated area"); *but see* 2015 Wis. Act 55, § 1922d (creating § 59.692(1d)(a) (prohibiting counties from enacting ordinances more restrictive than rules promulgated by department)).

with ordinances that "appear[] to be unique" and are drafted by municipalities in order to address "local concern[s]." *See id.*, ¶60.

¶20 Although the standard at issue here is a regulation and not a standard directly "established by the legislature," *see id.*, ¶59, the rationale behind *Ottman*'s rule against judicial deference applies with equal force under these circumstances. The department of natural resources duly promulgated WIS. ADMIN. CODE § NR 115.05(1)(b)3. as charged by the legislature.[5] Further, the City here has chosen to adopt this standard, which a state statute provides cities may voluntarily do, using language that is not merely substantively the same, but that essentially mirrors the state regulation for purposes of this case. Dwyer notes that numerous other Wisconsin cities have also adopted this standard, a point that the City concedes through silence. Thus, while the City is presumed to have adopted its ordinance with the purpose of protecting the welfare of its particular shorelands, the City chose to do so in the specific manner contained in the statewide standard. This is a standard that aims to achieve the purposes of WIS. STAT. § 281.31, and that calls for consistent interpretation statewide. *See* § 281.31(7) ("the department shall consult with the governing bodies of municipalities to secure voluntary uniformity of regulations"). Under these circumstances, if courts were to defer to the City's interpretation of the no-

---

[5] *See* WIS. STAT. § 281.31(1) ("To aid in the fulfillment of the state's role as trustee of its navigable waters and to promote public health, safety, convenience and general welfare, it is declared to be in the public interest to … authorize municipal shoreland zoning regulations for the efficient use, conservation, development and protection of this state's water resources."); WIS. ADMIN. CODE § NR 115.01. And, to repeat, WIS. ADMIN. CODE § NR 115.05(1)(b)3. was promulgated as a statewide standard for all counties to adopt, and was available for all cities to adopt voluntarily. *See* § 281.31(2)(c), (6)-(7) ("the department [of natural resources] shall prepare and provide to municipalities general recommended standards and criteria … for navigable water protection regulations and their administration"; "[t]he department [and] the municipalities … shall mutually cooperate to accomplish the objective of" § 281.31).

habitation ordinance, this could risk granting the City disproportionate influence over how the standard in § NR 115.05(1)(b)3. is applied by counties and municipalities across the state. This is the risk that the *Ottman* rule about statewide standards seeks to avoid.

¶21 In sum on this issue, we interpret the meaning of the no-habitation ordinance without deference to the Zoning Board.

*Interpretation of "Use for Human Habitation"*

¶22 We generally interpret ordinances in the same way that we interpret statutes. *See Milwaukee Dist. Council 48 v. Milwaukee County*, 2019 WI 24, ¶11, 385 Wis. 2d 748, 924 N.W.2d 153. Under this approach, we give the language of the ordinance "'its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning.'" *Id.* (quoted source omitted). "Context and structure are also important" to the meaning of the ordinance. *Id.* We interpret the language of the ordinance "'in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results.'" *See id.* (quoted source omitted).

¶23 At the heart of each issue raised in this appeal is the meaning and application of the City's prohibition on the "use of a boathouse for human habitation." For example, Dwyer does not contest that the no-habitation ordinance applies to his planned boathouse. This ordinance is part of the City's zoning rules addressing its "wetland-shoreland" zoning district, and Dwyer does not dispute that the boathouse is located inside the City's wetland-shoreland district. *See* MONONA ORD. § 466-26.A(1) (defining part of scope of wetland-shoreland

district). Similarly, he does not dispute that he needs a permit from the City to construct the boathouse. *See* MONONA ORD. § 175-8.E. (permits required for "accessory structures"), § 175-20 (defining accessory structure in part to include "structures such as boathouses …").

¶24 But this leaves undefined the following core terms: "use" and "habitation." These terms are not given specific or technical definitions in either the City's ordinances or WIS. ADMIN. CODE ch. NR 115. *See* MONONA ORD. § 466-48 (defining "terms" for purposes of "floodplain and shoreland-wetland zoning" chapter of ordinances); § NR 115.03 (providing definitions for ch. NR 115).

¶25 We begin with the verb "use." The no-habitation ordinance prohibits a specified "use" of a boathouse. Viewed in isolation, this might suggest that the no-habitation ordinance is not violated until there is an actual human habitation use. But, in the context of the Zoning Board's review of the building inspector's decision regarding a permit for a not-yet-complete boathouse, the inspector could certainly interpret "use" to include whatever he could reasonably predict about human habitation of the boathouse following its construction. Moreover, "use" is not limited to the specific uses that the current owner may plan to pursue, or does in fact pursue, following completion of construction. Instead, when additional, related City ordinances are taken into account, the regulated "use" would include that by any current or future owner, given the design of the boathouse.

¶26 We now explain this idea further, with reference to additional ordinances. The City's building inspector is obligated to enforce zoning rules through tools that include the ability to rescind permits for planned buildings that

11

merely or mostly exist as designs on paper. *See* MONONA ORD. § 175-7.C. (inspector must "revoke" already issued permit if he or she "finds at any time that the ordinances … are not being complied with …"); *see also* MONONA ORD. § 175-8.E. ("If the Building Inspector finds that the proposed building will comply with all ordinances of the City … [the inspector] shall officially approve the same and shall issue a building permit.").[6] Such planned buildings will, of course, not yet have been given any meaningful use by the current owner, and therefore the inspector is required to assess whether the design of a planned building complies with zoning regulations before the building is ready for use. For these reasons, it would not be reasonable to interpret the no-habitation ordinance to require the inspector to wait to revoke all or part of a building permit until after the current owner has actually inhabited a new boathouse. Having to wait for completion of construction would prevent the inspector from playing a meaningful role in enforcing the no-habitation ordinance. Accordingly, we apply a design-based definition of "use" that is not limited to those uses that Dwyer has expressed that he plans to pursue.

¶27 On appeal, Dwyer refers to positions that he took before the Zoning Board, namely, that he intended to limit uses of a bathroom-equipped boathouse to recreational uses and that he did not intend to include the bathroom to facilitate overnight or extended occupation of the boathouse. But he does not develop an

---

[6] Dwyer does not contest that these directives to the inspector—involving revocation because of noncompliance and approval of permits when there is compliance—include compliance with the City's zoning ordinances. Nor does he contend that the inspector lacked the general authority to partially rescind a permit of the type at issue here based on the inspector's determination, if justified, that a permitted project would violate a City ordinance if it were completed as designed and initially permitted. For example, Dwyer raises no version of a vested right or estoppel argument.

argument that the Board was required to accept those positions or to take them into account in reviewing the inspector's decision.[7]   In any case, our design-based interpretation of "use" directly undermines any argument suggested by Dwyer that his expressed plans for how he would use the boathouse were unreasonably ignored by the Board.

¶28   Turning to "habitation," according to dictionary definitions that we consider to be apt, this is the act of persons dwelling in, inhabiting, occupying, or residing at or in a location.[8]   *See Habitation*, OXFORD ENGLISH DICTIONARY ("The action of dwelling in or inhabiting as a place of residence; occupancy by inhabitants.") (last modified Mar. 2025); *Habitation*, MERRIAM-WEBSTER DICTIONARY ("the act of inhabiting; occupancy") (last updated Mar. 2025); *Habitation*, AMERICAN HERITAGE DICTIONARY ("[t]he act of inhabiting or the state of being inhabited"; "[a] residence") (5th ed. 2022); *see also* WIS. ADMIN. CODE § NR 116.03(26) (defining "human habitation" to mean "a human residence or dwelling" for purposes of the department of natural resources' floodplain regulations in WIS. ADMIN. CODE ch. NR 116).[9]

---

[7] On appeal, Dwyer refers to the fact that he offered to provide the City with a restrictive covenant, or to submit to a conditional use permit, providing that the boathouse could not be used for human habitation if the plumbing for a bathroom were allowed.  The Zoning Board did not appear to factor this offer into its review of the building inspector's decision.  But Dwyer does not develop a related legal argument and accordingly we do not address this concept further.

[8] "'A dictionary may be utilized to guide the common, ordinary meaning of words.'" *See Amazon Logistics, Inc. v. LIRC*, 2023 WI App 26, ¶44, 407 Wis. 2d 807, 992 N.W.2d 168 (quoting *Noffke ex rel. Swenson v. Bakke*, 2009 WI 10, ¶10, 315 Wis. 2d 350, 760 N.W.2d 156).

[9] At least for purposes of this case, the term "human," in the phrase "human habitation," appears to add nothing that is not already obvious.  The definitions that we quote regarding "habitation" unambiguously contemplate people, as opposed to animals or inanimate objects, inhabiting or occupying a place other than on a transient or passing basis, and neither side in this appeal suggests differently.

¶29 In addition, dictionaries confirm our intuition that "habitation" generally connotes at least some level of consistency and permanency, in contrast to merely a transient or passing presence in a place. For example, someone visiting a boathouse during the course of a day or over multiple days, but without ever staying overnight, would typically be a mere transient visitor and not one who inhabits the boathouse. As one dictionary puts it, "habitation" is the act of being inhabited, *i.e.*, "having inhabitants," and "inhabitant[s]" are those who "inhabit a place, especially as a permanent resident." *See Habitation*, *Inhabited*, *Inhabitant*, AMERICAN HERITAGE DICTIONARY (5th ed. 2022); *see also Occupancy*, MERRIAM-WEBSTER DICTIONARY ("the fact or condition of holding, possessing, or residing in or on something").

¶30 Summing up on these definitions, given the nature of the building inspector's ordinance-based authority and obligation to enforce zoning requirements, the inspector could determine how a prospective boathouse's design could allow use for human habitation, that is, use of the boathouse as a structure suitable for occupancy by persons other than on a transient or passing basis.

¶31 We note that this set of definitions is consistent with the statutory and regulatory purposes stated in WIS. ADMIN. CODE § NR 115.05 and in the Monona Ordinance containing the no-habitation ordinance. *See* WIS. ADMIN. CODE § NR 115.01 (noting purposes for WIS. ADMIN. CODE ch. NR 115 that include "'further[ing] the maintenance of safe and healthful conditions; prevent[ing] and control[ling] water pollution; … control[ling] building sites, placement of structure and land uses and reserve[ing] shore cover and natural beauty'" (quoting WIS. STAT. § 281.31(1)); MONONA ORD. § 466-3 (noting purposes of ordinance chapter including the no-habitation ordinance that include "Protect[ing] life, health and property"). That is, our interpretation comports with

purposes that include discouraging persons from residing in such proximity to the lake with enough consistency to elevate the risks of either water pollution or injuries or property damage arising from water hazards.

¶32    To be sure, the generic wording of the no-habitation ordinance dictates a relatively broad definition.  The combinations of boathouse features that will cause a particular design to render the structure suitable for habitation by persons for non-transitory periods will necessarily vary based on particular factual circumstances.  Dwyer argues for a degree of specificity that is not conveyed by the broad-reaching language of the no-habitation ordinance.  We now explain why we reject Dwyer's more specific interpretation.

¶33    Dwyer makes a two-step argument to the effect that the no-habitation ordinance prohibits only boathouses that have "living, cooking, sanitary[,] and sleeping facilities."  Dwyer's first step is to note, as we already have above, that some dictionary definitions of "habitation" include "dwelling." *See supra*, *Habitation*, OXFORD ENGLISH DICTIONARY.  Dwyer's second step is to observe that the City's building code defines "dwelling unit" as "[o]ne or more rooms with provisions for living, cooking, sanitary[,] and sleeping facilities arranged for habitation by one family."  *See* MONONA ORD. § 175-27.A. (also defining "dwelling" to mean "[a] place of abode, a residence or house for use by one or more persons, excluding hotels or motels.").

¶34    The second step in Dwyer's argument is contradicted by the ordinances.  As the City notes, the "dwelling unit" definition identified by Dwyer applies to special regulations relating to the City's "Construction Standards Code," which are not applicable to boathouses.  *See* MONONA ORD. § 175-27.A. (listing "dwelling unit" among definitions that "shall be applicable *in this section*," *i.e.*,

15

ORD. § 175-27 (emphasis added)). Instead, these regulations govern the construction of multi-unit or rental residences. *See, e.g.*, ORD. § 175-27.F(1)(a)[1] (setting parking space limits for "properties on which three or more dwelling units exist"). Dwyer fails to support the proposition that the building code definition that he identifies aids in the interpretation of "human habitation" involving boathouses in the no-habitation ordinance. So far as he shows, the purpose of defining "dwelling unit" in the building code (which involves regulating multi-unit or rental residences) has no evident connection to the purposes of the wetland-shoreland zoning scheme at issue here (which involves policy goals that include prohibiting "certain uses detrimental to the shoreland-wetland area"). *See* MONONA ORD. § 466-3 (statement of purpose for floodplain and shoreland-wetland zoning ordinance).

*Application to Zoning Board's Decision*

¶35 Having provided an interpretation of the pertinent terms in the no-habitation ordinance, we now determine whether Dwyer overcomes the presumption that the Zoning Board applied that provision using a correct theory of law. Much of Dwyer's argument on this issue focuses on the Zoning Board's written order; he largely ignores other parts of the record. However, we must consider both the Board's written decision and the transcript of the Board's hearing. *See **Lamar Cent. Outdoor, Inc. v. Board of Zoning Appeals of City of Milwaukee**, 2005 WI 117, ¶35 & n.15, 284 Wis. 2d 1, 700 N.W.2d 87; **Block v. Waupaca Cnty. Bd. of Zoning Adjustment**, 2007 WI App 199, ¶7, 305 Wis. 2d 325, 738 N.W.2d 132.

¶36 A key feature of Dwyer's argument is that, in the written order, the Zoning Board failed to state or explicitly apply a definition of "human habitation."

16

Dwyer notes that our supreme court has explained in a similar context that zoning boards must "provide reasons for determination[s]." *See **Lamar***, 284 Wis. 2d 1, ¶¶26-29; ***Driehaus v. Walworth County***, 2009 WI App 63, ¶13, 317 Wis. 2d 734, 767 N.W.2d 343 (county zoning "board must apply the appropriate legal standards and adequately express the reasons for its decision on the record" (citing ***Lamar***, 284 Wis. 2d 1, ¶4)).[10]  However, the Zoning Board was not required to provide "a detailed or explicit explanation" of its reasoning.  *See **Oneida Seven Generations***, 362 Wis. 2d 290, ¶49.  Rather, the Board's "decision need only contain enough information" for this court "to discern the basis" of the decision.  *See **id.***; *see also **AllEnergy Corp. v. Trempealeau Cnty. Env't & Land Use Comm.***, 2017 WI 52, ¶23 n.14, 375 Wis. 2d 329, 895 N.W.2d 368 ("for meaningful review, a reviewing court must be able to discern from the record or the transcript of the proceedings before the board the reasons for" the board's decision (citing ***Lamar***, 284 Wis. 2d 1, ¶¶31-35)).  Applying these standards here, we conclude that Dwyer does not meet his burden.

---

[10] We assume in Dwyer's favor that statements of our supreme court in ***Lamar*** apply here in full, namely, the court's statements that a city zoning board was required to "provide reasons for its determination" that statutory criteria were not met, instead of merely stating this in a conclusory fashion.  *See **Lamar Cent. Outdoor, Inc. v. Board of Zoning Appeals of City of Milwaukee***, 2005 WI 117, ¶¶26-29, 284 Wis. 2d 1, 700 N.W.2d 87.  We make this assumption even though the court in ***Lamar*** relied at least in part on a statute that has been repealed since ***Lamar*** was decided.  *See **id.***, ¶¶11 n.6, 27-28 (referring to WIS. STAT. § 62.23(7)(e)9. (2001-02) as "the controlling statute"); 2005 Wis. Act 34, § 6 (repealing § 62.23(7)(e)9.).  In favor of the assumption we now make, the court in ***Lamar*** also referenced: secondary authority, *see **id.***, ¶26 (citing, *e.g.*, Yokley, ZONING LAW AND PRACTICE § 20-16 at 20-68); common law principles of certiorari review, *see **id.***, ¶¶16, 26 ("'absence of discretion'" caused by a board's failure to state its reasoning is "a violation of the third prong of certiorari review," *i.e.*, the board acting arbitrarily); and "traditional notions of due process," *see **id.***, ¶29.  Further, our supreme court has applied aspects of ***Lamar*** following the repeal of the pertinent statute.  *See **AllEnergy Corp. v. Trempealeau Cnty. Env't & Land Use Comm.***, 2017 WI 52, ¶23 n.14, 375 Wis. 2d 329, 895 N.W.2d 368.  As we explain in the text, we conclude that Dwyer fails to establish that the Zoning Board should be reversed on certiorari review based on an alleged failure to provide reasons for its determination.

17

¶37    We begin with a basic point.  There is record support for the way that the Zoning Board identified the issue before it.  That is, the hearing transcript reflects that Board members properly understood that the issue was whether the building inspector could, consistent with the no-habitation ordinance, partially rescind the building permit based on the inspector's determination that the boathouse, as designed, would be suited for use for human habitation.  More specifically, the record shows a reasonable basis for the Board's understanding that the inspector determined that the inclusion of plumbing for a bathroom, as the design called for, would allow the boathouse to be used for human habitation, when all permitted features are taken into account, including electricity and HVAC.[11]

¶38    Dwyer observes that the inspector did not testify or submit materials to the Zoning Board.  Further, he notes that the inspector's written notice to Dwyer did not explicitly state that including plumbing in the boathouse was what, in the inspector's view, made its design capable of use for human habitation.  However, under the circumstances, we conclude that it was reasonable for the Zoning Board to interpret the inspector's decision to reflect the inspector's determination that including plumbing in the boathouse made the difference, triggering a violation of the no-habitation ordinance.  The Board had before it both the inspector's notice

---

[11] The following are examples of this framing.  After the close of comments, legal counsel for the City said that the issue before the Zoning Board was whether the building inspector properly determined that the proposed boathouse was going to be what the City's attorney described as a "habitable structure" under the no-habitation ordinance.  The attorney said that this turned on whether the boathouse would become a "structure or portion thereof used for or designed for human habitation."  The next board member to speak (Brad Schweiger) framed the issue as "whether or not the building inspector made a proper determination that the boathouse is constructed for human habitation."

and design plans submitted by Dwyer showing the inclusion of a bathroom, as well as the renewed permit that did not allow plumbing.

¶39    With this understanding of the issue, several Board members proceeded to discuss a variety of design features of boathouses that the members thought would render them suitable for human habitation.  Member Brad Schweiger said that, based on how some "towns," "such as Bayfield," define "building use for human habitation," the following is necessary to define the phrase "use for human habitation": "a dwelling or a business that has or needs a water supply or that has or needs a drain, drain system or plumbing fixture …."  If Dwyer's boathouse includes plumbing, Schweiger continued, it "can easily be used for human habitation."  Schweiger also expressed the view that the prohibited boathouse "human habitation" can include occupancy that lasts for only "a temporary time"—"it just has to be habitable for an indefinite period of time or a short period of time."

¶40    Board member Elizabeth Piliouras expressed the view that what makes a structure habitable "includes plumbing and heating and cooling."  This idea was echoed by board member Wynn Davies, who said that, in order to use plumbing to facilitate a space for habitation in Monona, Wisconsin, "constant heat" is required to avoid frozen pipes.  "[T]hat means … you would have to retain heat inside that building year-round so you do not damage any plumbing fixtures," and therefore heat and plumbing are both required "if it is or could be habitable space."  Davies said that Dwyer's boathouse was designed to be "weather-protected" and thus, if it included plumbing for a bathroom, it would be "suitable [for habitation] in that sense."

¶41    This discussion represents sufficient evidence that Board members applied an understanding of "human habitation" that is consistent with our interpretation above.  To clarify, we do not conclude that our interpretation necessarily requires the result that the Board reached.  Rather, we conclude that Dwyer fails to overcome the presumption that this discussion was consistent with the broad definition of "human habitation" that we identify above.  In sum, members expressly considered which kinds of structural features would make a boathouse habitable in general—taking into account relevant factors such as the climate in south central Wisconsin—and the role of plumbing in rendering a boathouse with this design habitable.

¶42    Dwyer essentially argues that we should ignore the more substantively robust portions of the Zoning Board's discussion of "human habitation" and instead focus on specific aspects of the Board's reasoning that he submits are erroneous.  But this would not be consistent with applicable review standards, under which we presume the correctness of the Board's decision and consider the Board's decision in light of the record as a whole.

¶43    Explaining further, instead of coming to grips with the Zoning Board's discussion of the meaning of "human habitation," Dwyer focuses narrowly on what he argues are two errors reflected in the Board's written order and what various Board members said at the hearing.  The first alleged error was reliance on a "Bayfield" ordinance regarding habitability.  Dwyer alleges that there is no such ordinance.  There appears to be no dispute that the Town of Bayfield, Wisconsin, does not have an ordinance matching member Schweiger's description of what "other towns … such as Bayfield," do to regulate boathouses.  Yet Dwyer does not persuade us that, regardless how this reference came about or what it meant, it undermines the Board members' discussion of reasonable

considerations regarding the meaning of human habitation as it applies to the design of Dwyer's boathouse. Put differently, Dwyer does not explain how Schweiger's reference to a Bayfield ordinance, or anything else that Schweiger said, was erroneous in a way that undermined the substance of the Board's discussions. *See Lamar*, 284 Wis. 2d 1, ¶¶30-31 ("most board members are not attorneys …. We do not expect boards of zoning appeal to produce judicial opinions."). Dwyer does not support his assertion that Schweiger's reference to a Bayfield ordinance amounted to an attempt to "invent law" to justify a desired result.

¶44 The second legal error alleged by Dwyer involves the following statement in the Zoning Board's written decision:

> The determination of habitable is to the Building Inspector's interpretation. Given the subject matter expertise of the Inspector, the Board shared that [Board members] had not heard enough to definitively say the Inspector was in error and overturn the decision.

It is true that, considered in isolation, this statement suggests that the Zoning Board could abdicate its responsibility to apply its own understanding of the meaning of "human habitation" to the facts, and defer entirely to the inspector's views or positions, which as Dwyer points out were not articulated in detail in the inspector's notice of partial recission. However, Dwyer fails to show that, when the hearing transcript and the written decision are construed in their entirety, the Board as a whole, or even its majority, understood that they were required to, or did in fact, rely on the building inspector to establish the legal standard and to apply that standard here without exercising their discretion. Notably, when construed in the fuller context, one reasonable interpretation of this statement would be that the Zoning Board concluded that Dwyer failed to show that the

21

inspector's determination was improper under the correct legal standard as applied to these facts, based on the assessment of Board members regarding the significance of plumbing to the concept of "human habitation," when added to all other design features of the boathouse. In other words, one reasonable interpretation of the record is that the Board was simply expressing agreement with the inspector's decision, and not expressing blind adherence to his views and positions.

## II. Substantial Evidence

¶45 Dwyer argues that the Zoning Board's decision was not supported by substantial evidence. Again here, the argument rests heavily on the Board's written order, this time with an emphasis on a statement that the Board denominated as a "factual finding." This "factual finding" was the following: "Affirming the determination of the City's Building Inspector … rescinding [the initial permit] because the Inspector determined the Boathouse is constructed for human habitation …." Dwyer apparently means to suggest that our determination of whether the Zoning Board's decision was supported by substantial evidence depends on whether the written statement contains explicit findings supported by substantial evidence. As noted above, however, our review is not limited to the Board's written decision. We consider the record as a whole to discern the Board's findings and reasoning. *See Lamar*, 284 Wis. 2d 1, ¶35 & n.15; *Oneida Seven Generations*, 362 Wis. 2d 290, ¶49. Similarly, when applying the "substantial evidence test" on certiorari review, we "'take into account all the evidence in the record,'" including evidence that the Board did not explicitly rely on. *See Oneida Seven Generations*, 362 Wis. 2d 290, ¶45 (quoted source omitted).

¶46    Based on these standards, Dwyer completely fails to show that the Board's decision was not supported by substantial evidence. Our brief outline of the nature of the evidence below is sufficient to meet the pertinent standards, which we now summarize.

¶47    "'Substantial evidence is evidence of such convincing power that reasonable persons could reach the same decision as the board.'" *Id.*, ¶43 (quoted source omitted). "[S]ubstantial evidence is less than a preponderance of the evidence," but "it is 'more than a mere scintilla' of evidence and more than 'conjecture and speculation.'" *Id.*, ¶44 (quoted source omitted).

¶48    Dwyer submitted materials to the Zoning Board that included: construction plans for the boathouse, some reflecting plumbing for a sink and toilet; the initial building permit; the building inspector's letter partially rescinding the initial permit; the subsequently issued permit that did not allow plumbing; and photographs of the boathouse showing substantial progress in construction. These materials established the following undisputed facts before the Zoning Board that we have already noted above and briefly summarize now. At the time of the partial rescission of the initial permit, Dwyer's boathouse was designed to include plumbing for a bathroom, in addition to electrical service and HVAC. The initial building permit allowed plumbing, electrical service, and HVAC. The building inspector sent Dwyer a notice that the inspector rescinded any right to include facilities for human habitation in the boathouse, as designed. The later-issued permit no longer allowed plumbing, although it continued to allow electrical service and HVAC. The zoning administrator described for the Zoning Board his meeting with the building inspector to discuss the permit, and the administrator's understanding of how plumbing has been used for recreational purposes in other

23

boathouses in the City, such as water lines and spigots for cleaning related to boating and fishing.

¶49    In addition, several members of the Board expressed the view that Dwyer's boathouse, as initially designed, had features that qualified it for year-round use for human habitation.  Taken together, the evidence and what appear to have been reasonable inferences by Board members amount to much more than a "mere scintilla."  *See* ***Town of Hudson v. Hudson Town Bd. of Adjustment***, 158 Wis. 2d 263, 277, 461 N.W.2d 827 (Ct. App. 1990) (town board of adjustment could reasonably infer information in a permit application reflecting that truck parking would be added to the applicant's property, that granting a permit would increase town's traffic volume).

### III.  Not Arbitrary or Unreasonable

¶50    Dwyer contends that the Zoning Board's challenged decision was arbitrary.  Whether the Zoning Board acted "arbitrarily or unreasonably" in a way that requires relief under certiorari review depends on whether the Board's action "'represented its will and not its judgment,' such that it 'is the result of an unconsidered, willful or irrational choice.'"  *See* ***Halter v. Wisconsin Interscholastic Athletic Ass'n***, 2025 WI 10, ¶30, 415 Wis. 2d 384, 19 N.W.3d 58 (*citing* ***Van Ermen v. DHSS***, 84 Wis. 2d 57, 63-65, 267 N.W.2d 17 (1978)).  We now address the two specific arguments that Dwyer makes on this topic: (1) the Board decision was arbitrary because there are other boathouses in the City with bathrooms; and (2) the Board was improperly swayed by public opinion.

¶51    Regarding the other-bathrooms argument, Dwyer fails to provide sufficient factual support from the record to show arbitrariness.  The beginnings of such an argument would appear to require proof that it was the *Zoning Board's*

24

actions that caused unjustified differences in outcomes between similarly situated permit applicants. *See* WIS. STAT. § 62.23(7)(e)10.; *see Lamar*, 284 Wis. 2d 1, ¶16 (describing limited nature of certiorari review, focusing on the decision of the zoning board). Yet Dwyer merely directs us to record evidence suggesting that at least one of his neighbors had been recently allowed to build a boathouse with a bathroom. He identifies no evidence that this alleged outcome was the result of the Board's actions or inactions, as opposed to actions or inactions of city staff that were never brought before the Board. Further, even if we assume without deciding that the Board had some involvement in allowing bathroom plumbing to be installed for one or more other boathouses in the City, the evidence identified by Dwyer does not show the specific circumstances under which this occurred, as would be necessary to support a determination of arbitrariness.

¶52 Beyond those shortcomings, Dwyer does not provide legal support for the premise that the Zoning Board taking actions to allow bathrooms in other boathouses, to the extent this may have occurred, would necessarily render the challenged decision arbitrary. Success on this issue would require Dwyer to show that the Zoning Board applied an arbitrary process in making the decision to affirm the partial recission in this case. *See Halter*, 415 Wis. 2d 384, ¶30 (describing issue before the court as "whether in … Halter's case," the decision-making body at issue "applied its rules arbitrarily or unreasonably").

¶53 Turning to Dwyer's public-pressure argument, again he fails here to support his argument with record evidence that shows arbitrariness. Dwyer accurately observes that public comment was uniform in opposing his plans for a boathouse generally—or at least opposing all boathouses that have bathrooms. Many public comments did not appear to be relevant to the specific issue before the Board involving the inspector's partial revocation of the permit. For example,

some commenters expressed concerns about the noise caused by construction of the boathouse or that once completed it would be an "eyesore." But Dwyer does not identify any aspect of the Board's reasoning process, as expressed by any member of the Board, much less a majority of the Board, that actually relied on irrelevant public comment. Dwyer may mean to argue that public opposition must have improperly swayed the Board because the Board failed to apply a rational process of reasoning supported by substantial evidence. But, as explained above, we conclude that Dwyer does not show such a failure.

## CONCLUSION

¶54　For all of these reasons, we affirm the circuit court's order denying Dwyer's certiorari challenge to the Zoning Board's decision.

*By the Court*.—Order affirmed.

Recommended for publication in the official reports.